No. 15-30359

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

v.

**JON MICHAEL HARDER,**

**Defendant-Appellant.**

———————————

Appeal from the United States District Court

for the District of Oregon

Portland Division

———————————

**BRIEF OF APPELLANT**

———————————

**Christopher J. Schatz**
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123; Fax: (503) 326-5524**
**Email: Chris_Schatz@fd.org**

**Robert B. Hamilton, Attorney at Law**
**2929 SW Multnomah Blvd., Suite 205**
**Portland, OR 97219**
**Tel: (503) 535-0630**
**Email: Robert@rhamiltonlaw.com**

**Emily Elison**
**Tarchia Law P.C.**
**161 St. Helens Street**
**Suite 105**
**St. Helens, OR 97051**
**Tel: (503) 223-0011**
**Email: emily@tarchialaw.com**

**Attorneys for Defendant-Appellant**

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iv

Statement of Jurisdiction.............................................................1

Statement of Issues.....................................................................2

Statement of the Case.................................................................3

Nature of the Case......................................................................3

Procedural History .....................................................................3

Relevant Facts ...........................................................................6

    A.    In the Beginning. ........................................................8

        1.    The Sunwest Business Plan. ..................................10

        2.    The TIC And PMI Investments................................13

        3.    The TIC Investment Structure. ...............................15

        4.    The PMI Investment Structure................................17

        5.    Intercompany Loans................................................18

        6.    Control of the Businesses.........................................23

        7.    The Role Of The Attorneys......................................23

        8.    The *Kraus* Litigation...............................................24

        9.    The Investment Marketing Process..........................28

        10.    The Downfall. .......................................................34

i

Standard of Review .................................................................43

Custody/Bail Status/Release Date..............................................44

Summary of Argument...............................................................44

Argument.................................................................................48

I.    THE DISTRICT COURT ERRED IN FINDING THAT MR.
HARDER FORMED AN INTENT TO DEFRAUD THE SUNWEST
TIC AND PMI INVESTORS AS ALLEGED IN THE AMENDED
INDICTMENT. ..........................................................................48

    A.    The Nature Of The Scheme To Defraud. ............................48

    B.    The Key Factor In The Scheme To Defraud Determination Is
Whether Mr. Harder Formed An Intent To Defraud And, If So,
When....................................................................................49

    C.    Judge Simon's Failure To Comment On The Testimony Of DWT
Attorney Dozois With Respect To Responsibility For Failing To
Disclose Sunwest's Intercompany Lending And Its Cash Burn
Problem Raises Due Process Fair Sentencing Concerns. ..................57

II.   BY READING LETTERS SUBMITTED TO THE COURT
CONCERNING ISSUES SUBJECT TO RESOLUTION DURING
THE PHASE I HEARING, JUDGE SIMON VIOLATED MR.
HARDER'S ENTITLEMENT TO A PROCEEDING BEARING THE
APPEARANCE OF JUSTICE. .....................................................63

    A.    Criminal Prosecutions Are A Component Of Public Governance,
Not Private Vengeance; It Is Therefore Critical That The
Appearance Of Justice Be Preserved. ................................63

    B.    The Court's Consideration Of Victim Impact Letters During The
Phase I Hearing Interfered With Mr. Harder's Due Process
Rights...................................................................................64

C.  The Government Improperly Encouraged Investors To Contact The Court Before They Were Found To Be Victims.........................68

III.  CONCLUSION.............................................................................71

# TABLE OF AUTHORITIES

**Page**

## FEDERAL COURT CASES

*Berger v. United States,*
    295 U.S. 78 (1935)................................................................64

*Carpenter v. United States,*
    484 U.S. 19 (1987)................................................................52

*Gregory v. United States,*
    253 F.2d 104 (5th Cir. 1958) ................................................52

*In re Geneva ANHX IV LLC,*
    496 B.R. 888 (C.D. Ill. 2013) ...............................................12

*In re Murchison,*
    349 U.S. 133 (1955) .............................................................66

*Irwin v. United States,*
    338 F.2d 770 (9th Cir. 1964) ................................................49

*Kenna v. United States District Court for C.D. California,*
    435 F.3d 1011 (9th Cir. 2006) ..............................................69

*Kraus et al. v. Harder,*
    No. 03-1198-MO,
    2004 WL 716576 (D. Or. Mar. 31, 2004) ............................24-27, 58, 59, 72

*Levine v. United States,*
    362 U.S. 610 (1960) .............................................................64

*Liteky v. United States,*
    510 U.S. 540 (1994) .............................................................66

*Morissette v. United States,*
    342 U.S. 246 (1952) ...................................................................49

*Neder v. United States,*
    527 U.S. 1 (1999)......................................................................52

*Pasquantino v. United States,*
    544 U.S. 349 (2005) .................................................................52

*Rita v. United States,*
    551 U.S. 338 (2007) .................................................................67

*Schmuck v. United States,*
    489 U.S. 705 (1989) .................................................................50

*Townsend v. Burke,*
    334 U.S. 736 (1948) .................................................................63

*United States v. Abreu,*
    202 F.3d 386 (1st Cir. 2000)....................................................67

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000) ....................................................51

*United States v. Bohonus,*
    628 F.2d 1167 (9th Cir. 1980) .................................................49

*United States v. Brien,*
    617 F.2d 299 (1st Cir. 1980).....................................................50

*United States v. Colton,*
    231 F.3d 890, 898 (4th Cir. 2000) ..................................... 51, 56

*United States v. Dowling,*
    739 F.2d 1445 (9th Cir.1984), *rev'd on other grounds*, 473 U.S. 207
    (1985)......................................................................................51

v

*United States v. Goodman,*
    984 F.2d 235 (8th Cir. 1993) ........................................................50

*United States v. Green,*
    745 F.2d 1205 (9th Cir. 1984) ....................................................49

*United States v. Harder*,
    116 F. Supp.3d 1197 (D. Or. 2015) ..................................... passim

*United States v. Huchins,*
    53 F.3d 276 (9th Cir. 1995) .........................................................67

*United States v. Jinian,*
    725 F.3d 954 (9th Cir. 2013) .......................................................49

*United States v. Jones,*
    472 F.3d 1136 (9th Cir. 2007) .....................................................53

*United States v. Mezas de Jesus,*
    217 F.3d 638 (9th Cir. 2000) ................................................ 66-67

*United States v. Petty*,
    982 F.2d 1365, 1369 (9th Cir.),
    *amended* 992 F.2d 1015 (9th Cir. 1993) .....................................67

*United States v. Rogers,*
    321 F.3d 1226 (9th Cir. 2003) .....................................................50

*United States v. Steffen,*
    687 F.3d 1104 (8th Cir. 2012) .....................................................52

*United States v. Sullivan,*
    522 F.3d 967 (9th Cir. 2008) .......................................................50

*United States v. Tavano,*
    12 F.3d 301 (1st Cir. 1993).........................................................62

vi

*United States v. Treadwell,*
  593 F.3d 990 (9th Cir. 2010) ........................................................53

*United States v. United States Gypsum Co.,*
  333 U.S. 364 (1948) ....................................................................43

*United States v. Watson,*
  1988 WL 101634 *2 (E.D. La. Sept. 28, 1988) ............................63

*United States v. Wynn,*
  684 F.3d 473 (4th Cir. 2012) .......................................................50

*Valansi v. Ashcroft,*
  278 F.3d 203 (3d Cir. 2002) ........................................................52

*Young v. United States ex rel. Vuitton Et Fils S.A.,*
  481 U.S. 787 (1987) ....................................................................64

## ADMINISTRATIVE DECISIONS

IRC § 1031 ................................................................... passim

Rev. Proc. 2002-22.................................................... 12, 20

Rev. Proc. 2002-22,............................................... 11, 12, 20

## FEDERAL STATUTORY AUTHORITIES

18 U.S.C. § 3161(h)(7)(B)(ii) ......................................................4

18 U.S.C. § 3742(a)(1)..................................................................1

18 U.S.C. § 3771(3) ....................................................................70

18 U.S.C. § 3771(a)(4).................................................................70

26 U.S.C. § 1031(a)(2)(D) ..........................................................19

28 U.S.C. § 1291..........................................................................1

vii

Crime Victim Rights Act, 18 U.S.C. § 3771 ..........................................66

## FEDERAL RULES AND REGULATIONS

Fed. R. App. P. 32(a)(5) ..............................................................76

Fed. R. App. P. 32(a)(6) ..............................................................76

Fed. R. App. P. 32(a)(7)(B) ...........................................................76

Fed. R. App. P. 32(a)(7)(C) ...........................................................76

Fed. R. App. P. 4(b) .....................................................................1

## ADDITIONAL AUTHORITIES

*Determining Liability In Hindsight*,
    Kim A. Kamin & Jeffrey J. Rachlinski, Law and Human Behavior,
    Vol. 19, No. 1 (1995) ...........................................................46

*For Those Condemned To Study The Past: Heuristics and Bias in
    Hindsight, in Kahneman, Slovic & Tversky, Judgment Under
    Uncertainty: Heuristics And Bias,* Baruch Fischhoff (Cambridge
    Univ. Press, 2005) ..............................................................47

*Hindsight: Biased Judgments Of Past Events After The Outcomes Are
    Known*, Scott A. Hawkins & Reid Hastie, Psychological Bulletin,
    Vol. 107, No. 3 (1990) ..........................................................46

*The Attorney As Gatekeeper:  An Agenda For The SEC*,
    John C. Coffee, 103 Column. L. Rev. 1293, 1312 (2003) ...........................57

*The Financial Crisis Inquiry Report* (Jan. 2011) .....................................6

*The Madoff Scandal, Market Regulatory Failure and the Business
    Education of Lawyers*, Robert J. Rhee,
    35 J. Corp. L. 363, 365 (2009) ..................................................56

*The Mitigation Of Hindsight Bias in Judges' Evaluation Of Auditor Decisions*, 16 Auditing: A Journal Of Practice And Theory, Anderson et al., (1997) .................................................................47

*When The Hurlyburly's Done: The Bar's Struggle With The SEC*, Susan P. Koniak,103 Colum. L. Rev. 1236 (2003) ....................................56

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the appeal pursuant to 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291. The District Court filed its Judgment in a Criminal Case on November 18, 2015 (CR 210, ER 008).[1] Mr. Harder filed a timely Notice of Appeal pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure on November 30, 2015 (CR 218, ER 007). This appeal is from the judgment and the sentence imposed and disposes of all issues that Mr. Harder reserved for appeal in his plea agreement with the government.

---

[1] References to the clerk's record on appeal are herein identified as "CR" followed by the appropriate docket control number. References to the Excerpts of Record are designated "ER" followed by the appropriate page number(s).

1

## STATEMENT OF ISSUES

I.    DID THE DISTRICT COURT ERR IN FINDING THAT THE SCHEME TO DEFRAUD EXTENDED BEYOND THE COUNTS OF CONVICTION SO AS TO ENCOMPASS ALL TENANCY-IN-COMMON AND PREFERRED MEMBER INVESTMENTS MARKETED BY SUNWEST FROM 2006 THROUGH 2008?

II.    DID THE DISTRICT COURT VIOLATE THE APPEARANCE OF JUSTICE BY READING, DURING THE FACT-FINDING PHASE I OF MR. HARDER'S SENTENCING HEARING, NUMEROUS DISPARAGING AND INFLAMMATORY LETTERS SUBMITTED BY FORMER SUNWEST INVESTORS?

## STATEMENT OF THE CASE

**Nature of the Case**

This appeal is from the 15-year sentence imposed on Mr. Harder following his entry of pleas of guilty to Counts 13 and 51 of the Amended Indictment. *See* Judgment in a Criminal Case. CR 210; ER 008. The appeal addresses not the sentence per se, but the determinant factor found and considered by the District Court, the Honorable Michael H. Simon, in imposing sentence – i.e. the scope of the scheme to defraud perpetrated by Mr. Harder.

**Procedural History**

On September 18, 2012, a 56-count Indictment was returned against Mr. Harder charging him with mail and wire fraud and money laundering. CR 1; ER 123. The Indictment also contained forfeiture allegations pertaining to various items of personal property (a diamond ring and various vehicles), and as well Mr. Harder's interests in certain assisted living facilities owned and operated by a non-profit 501(c)(3) entity, The Aspen Foundation.

Mr. Harder was arraigned on September 21, 2012. CR 7. Mr. Harder entered pleas of not guilty to all of the counts alleged against him, and a denial as to the forfeiture allegations.

The case was subsequently declared "complex" pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii). CR 21. Following the District Court's granting of Mr. Harder's Motion To Strike Surplusage From The Indictment [the term "Ponzi Scheme"] (CR 35), an Amended Indictment was filed on May 5, 2014. CR 74; ER 093.

On January 8, 2015, pursuant to the terms of a negotiated plea agreement (CR 109; ER 082), Mr. Harder pled guilty to the mail fraud and money laundering charges set forth in Counts 13 and 51 respectively.[2] The plea agreement provided that a novel, two-stage sentencing hearing would be conducted:

> The parties agree that the defendant's sentencing shall occur in two separate proceedings before the Court: (1) at the first, to begin May 12, 2015, the parties will introduce evidence and the court will make a determination whether defendant's scheme to defraud exceeded the counts of conviction, as alleged in the Indictment, and all relevant conduct related to it. The burden of proof the government is required to meet at this initial sentencing proceeding will be determined by the court prior to or at the time of this hearing; and (2) in November 2015, the court will conduct a second and final sentencing proceeding where the parties will present evidence and arguments as to the appropriate sentence the court should impose on the defendant.

CR 109, p. 1, ¶ 4; ER 082.

---

[2] Mr. Harder also admitted to certain of the allegations of forfeiture (CR 107); however, and again in accord with the plea agreement, the Aspen Foundation properties were stricken from the Amended Indictment (CR 108).

4

District Judge Simon accepted the parties' agreement that the sentencing hearing would be conducted in two separate phases. The Phase I Hearing was to involve a determination as to the scope of the scheme to defraud. As noted by defense counsel: "We are here to determine whether the offense as alleged in the indictment is in fact the scheme that Mr. Harder purported to perpetrate." RT 56.[3]

Following the Phase I Hearing, a Phase II Hearing would then be conducted (as scheduled for November 16 and 17, 2015) to address the more routine aspects of sentencing, including the advisory Sentencing Guidelines computation, loss, restitution, § 3553(a) factors, and the imposition of sentence.

The Phase I Hearing commenced on May 12, 2015 (CR 134), and concluded on May 28, 2015 (CR 149). On July 20, 2015, Judge Simon filed his Findings of Fact and Conclusions of Law at Phase I of Defendant's Sentencing Proceeding. CR 169. Mr. Harder filed objections to several of the findings. CR 170; ER 067. On November 4, 2015, Judge Simon issued an Amended Findings of Fact and Conclusions of Law at Phase I of Defendant's Sentencing Proceeding. CR 189; ER 014. Based on the facts he found, Judge Simon concluded:

> The Court finds that the scope of Defendant's scheme to defraud exceeds the two counts of conviction and that the relevant conduct

---

[3] To this AUSA Kerin added: "We do intend to prove the scheme to defraud as alleged in the indictment." RT 59.

includes all Sunwest senior housing facility and senior housing development investments sold by Defendant, directly or indirectly by persons acting under his control, supervision, or direction, to investors from January 1, 2006, through July 7, 2008, regardless of the specific form of those investments, whether TIC or PMI.

*United States v. Harder*, 116 F. Supp.3d 1197, 1227 (D. Or. 2015) (footnote omitted); ER 066.

The Phase II Hearing was conducted on November 16 and 17, 2015. CR 206. After additional witnesses were heard, Judge Simon sentenced Mr. Harder to a 15 year term of imprisonment. CR 206, 207.[4]

**Relevant Facts**

The circumstances giving rise to Mr. Harder's prosecution reach back over the course of his life, through the creation and subsequent demise of the Sunwest businesses and the ensuing Receivership proceedings, and through the international financial crisis that first reared its ugly visage in August of 2007.[5] At the time of the final stage of its demise in March, 2009, with the filing of an SEC fraud complaint against Mr. Harder and Sunwest Management, Inc. (SMI), the Sunwest businesses

---

[4] The Plea Agreement restricted the government to seeking no more than a 15 year term of imprisonment, and Mr. Harder to seeking no less than a 5 year term of imprisonment. ER 090 (¶ 11).

[5] *See THE FINANCIAL CRISIS INQUIRY REPORT*, 250 (Jan. 2011).

6

constituted a vertically integrated senior residential living provider. Among the entities included in this structure, in addition to SMI, were Canyon Creek Development, LLC (CCD), Canyon Creek Financial, LLC (CCF), KDA Construction, Senenet (an employee leasing agency), Contract Interiors, and Encore Indemnity (a captive insurer).

## A. In the Beginning.

In 1991, Mr. Harder borrowed $50,000 from his father, Fred Harder, and with Brad Colson as his partner, purchased a retirement facility, the Dorchester House, located in Lincoln City, Oregon. RT 1990.[6]  In February of 1992, Mr. Harder and Colson created the first of the Sunwest companies, Sunwest Management, Inc. (SMI) as a management entity based in Salem, Oregon. RT 1992.  Wally Gutzler, who was general counsel for Holiday Retirement at the time, drafted the Articles of Organization for SMI. RT 1992. Within a short period of time, the number of facilities under SMI management began to grow. RT 1992-93.

---

[6] Brad Colson was the son of William Colson, the owner of a large, mostly independent living facilities business known as Holiday Retirement. RT 1987. Holiday was sold in early 2007 for $6.6 to $6.7 billion.  RT 1288.

### B.     The Growth of the Company.

From the first acquisition of the Dorchester House in 1991, through 2007, Sunwest grew into the nation's fourth largest senior residential living management company. Prior to 1991, Mr. Harder had no specialized training or education in the operation of senior residential living facilities. RT 1994. He simply learned as Sunwest's business grew, and he listened to those he thought knew what they were doing in the senior residence industry. *Id*. Mr. Harder modeled much of what would eventually become the working structure of Sunwest's business operation on how Bill Colson ran Holiday Retirement.[7]

For many years, Mr. Harder and Brad Colson worked hard, sharing the menial tasks that go into the operation of a senior living facility. As the company grew, Mr. Harder delegated responsibility and issued ownership interests in Sunwest facility LLCs to others. Although not a computer user, Mr. Harder was "very busy" in his engagement with the Sunwest businesses, often receiving hundreds of emails a day. RT 774, 779.

---

[7] For example, the Sunwest centralized cash bank account known as the "JMH" account was put in place after Mr. Harder directed Curtis Brody to go over to Holiday and see how that firm was handling the cash and rent proceeds generated by the facilities it had under management. RT 576.

Mr. Harder hired people he knew to fill positions at Sunwest despite their shortcomings. For instance, in 1992 he hired Curtis Brody to handle SMI's financial affairs, even though Brody had not passed either the Oregon or Washington Accountancy Board tests for a CPA license. RT 1994-95.[8]

In September of 1999, Colson decided to leave SMI and he was bought out by Mr. Harder.  RT 1998.   At this time, SMI had approximately 20 properties under management and another 20 properties in various stages of development.  RT 2004. Colson was replaced by three individuals: Darryl Fisher, who was at the time managing seven nursing homes; Eric Jacobson, who had been a finance director at Holiday Retirement and was at the time the chief operating officer for a public assisted living company, Regent; and Wally Gutzler, who had been general counsel of Holiday, and then a partner at Garrett Hemann in Salem, where he had continued to do legal work for Holiday affiliates. RT 1999. Jeff Kraus was also brought in as a

---

[8] Brody later held the title of Senior Vice-President of Finance and Accounting, and in approximately 2004 he became the CFO of Sunwest Management, Inc.  RT 572-73.

partner in various senior residence facilities and as the then CFO of Sunwest Management, Inc.  RT 1999.[9]

### 1. The Sunwest Business Plan.

In the early 2000s, there were many assisted living (ALFs) and other senior residential facilities on the market that Mr. Harder viewed as being undervalued. In his experience, it took two to three years to build and develop an assisted living facility, whereas an existing facility had the potential to be upgraded and turn a profit in a much shorter time.  RT 2010.  In addition, the demographics of the baby boomer generation indicated there would be a growing demand for senior residential facilities. RT 420. These circumstances led Mr. Harder to conclude that Sunwest's growth (in terms of economies of scale and market share) favored acquisition of existing, albeit underperforming facilities, rather than development of new facilities.

In the early 2000s, as the economy began to rebound after the recessionary dip that followed September 11, loan funds suddenly became plentiful. Banks would send representatives out to Salem to meet with Mr. Harder for the purpose of discussing property acquisition loans. RT 2023-24. The commercial finance banks

---

[9] Mr. Harder met Sunwest principals Derryl Fisher and Curtis Brody while attending Walla Walla University.  RT 1987-88.  Mr. Harder graduated from Walla Walla in 1989 with a degree in Marketing. *Id.*

were eager to loan funds for commercial property acquisitions, which loans could then be repackaged as securities (CDOs) and sold.[10]  Mr. Harder saw the banks' eagerness to lend as an opportunity to acquire undervalued assisted living and other senior care facilities and add them to the inventory of Sunwest managed properties.[11]

Prior to 2002, from a national perspective, there had been some use of IRC §1031 covered funds in investments in the senior residential housing market, but the then existing replacement property requirements limited the employment of this tax deferral provision in the commercial property investment arena. In 2002, the IRS issued Revenue Procedure 2002-22, which clarified the extent to which tenancy-in-common investors could claim capital gains deferral.[12] With the issuance of Revenue

---

[10] According to former CCF Senior VP of Marketing David Thurber, "there appeared, from my chair, to be a feeding frenzy for banks to loan money."  RT 433.

[11] As Judge Simon observed:

But there does seem to be a legitimate business concept, a legitimate business model here, as some of the witnesses have said, and that is to buy generally underperforming, undervalued assisted living facilities, improve them, improve the occupancy rate, and then either refinance or sell them.

RT 2236.

[12] *See* Rev. Proc. 2002-22, 2002-14 I.R.B. 733, 2002-1 C.B. 733, 2002 WL 417295 (IRS RPR).

Procedure 2002-22, and the consequent explosion in the TIC sponsor industry, an enormous amount of TIC investment money suddenly became available to Mr. Harder for use as mezzanine financing. RT 416;[13] *see also* Defense Exhibit 504, at pp. 13-14, ER 202-04.[14]

---

[13] As noted by the court in *In re Geneva ANHX IV LLC*, 496 B.R. 888, 894 (C.D. Ill. 2013):

> While Rev. Proc. 2002-22 outlines procedural requirements for obtaining a letter ruling, and is not a pronouncement of substantive law, it does set forth fifteen guidelines so that taxpayers who adhere to the necessary conditions may obtain private letter rulings to assure them that their tenancy-in-common interest[s] would not be considered partnership interests ineligible for like-kind exchange treatment.

Fueled by the first waves of retiring baby boomers and Rev. Proc. 2002-22, the TIC investments allowed investors to defer (potentially indefinitely) capital gains taxes on the sale of their previously held investment properties while avoiding day-to-day management responsibilities with respect to their new, fractionalized interest, passive commercial property investments. From the standpoint of role, TIC investors were no longer business operators focused on growing profits, but landlords receiving rent. *Id*. at 894 ("The co-owners' activities must be limited to those customarily performed in connection with the maintenance and repair of rental real property."). For Mr. Harder, the benefit of the TIC investments was that these investments provided the equity necessary to close facility acquisition deals. As noted by Davis Wright Tremaine (DWT) attorney Timothy Dozois: "The premise of all this is Jon wants these investors in as mezzanine financing, he wants to pay them a fair return for a period of time, and then he wants them out because he wants to own the property in its entirety." RT 1715.

[14] Defense Exhibit 504 contains an Analysis of The Impact of The Financial Crisis of 2007-2009 on The Sunwest Businesses. The forensic expert reports

The use of the Revenue Procedure 2002-22 criteria to bundle TIC investments in fractionalized real property interests generated a great deal of discussion in the TIC sponsor industry as to whether TIC investments were real property investments, or securities subject to securities regulatory and disclosure laws. Following the advice of his lawyers, Mr. Harder decided to form a broker dealer entity to oversee the marketing of the Sunwest investment packages. This decision led to the formation of Canyon Creek Financial, LLC (CCF), in 2006 as Sunwest's broker-dealer.

Mr. Harder was the 100% owner of CCF. In order to operate this entity, Mr. Harder obtained a Series 63 license. RT 2032.[15] Mark Wentzien, a former DWT attorney, was introduced to Mr. Harder by then DWT-attorney (and Sunwest outside counsel) Timothy Dozois. Wentzien became the first President of CCF. RT 2031.

### 2. The TIC And PMI Investments.

In order to attract investment dollars, the Sunwest lawyers came up with two different investment vehicles – the Tenancy-In-Common (TIC) investment and the

---

identified as Defendant Exhibits 503 and 504 were received by the court as the testimony of their respective authors. RT 667-68.

[15] Mr. Harder failed his first Series 63 license test, but passed on the second try. RT 2032.

Preferred Membership Interest (PMI) investment. Both investment structures employed Sunwest-managed assisted living facilities (ALFs). However, only the TIC investment structures were designed to enable investors to claim § 1031 deferred capital gains treatment.

Mr. Harder made the final decision with respect to the acquisition of new ALF facilities for the Sunwest portfolio. Before a property was acquired, it would be evaluated economically by Canyon Creek Development personnel. RT 802. The Canyon Creek Development staff would generate pro forma forecasts as to how the property was expected to perform over time. RT 801-02. This information, along with other data pertaining to the property, was then handed over to outside counsel for purposes of preparing the private placement memoranda that would be used to market investments in the property. RT 801.

Mr. Harder "had ownership in everything – a piece of ownership in virtually all of the communities that [Sunwest] had under management." RT 633. However, he did not have any involvement in putting together the documentation that was used to structure and market the TIC and PMI investments. RT 2029. DWT Attorney Dozois was Mr. Harder's "chief outside legal counsel," and he was the primary architect with respect to the TIC and PMI investment structures and documentation. RT 2029.

14

### 3.    The TIC Investment Structure.

The TIC investment structure went through a number of permutations as Dozois and other lawyers addressed the complexities of bank loan requirements on the one hand, predominantly single purpose entity covenants, and §1031's criteria on the other. In its final reiteration, the TIC investment structure involved a number of LLC entities:

> (1) The FeeCo LLC - whose membership consisted of Mr. Harder and one or more Sunwest principals. The FeeCo entity was the borrower on the bank loan mortgage. At the close of escrow, the FeeCo transferred some of its ownership interests to the TICs; the TIC purchase funds (representing the entirety of the proceeds from the sale of the TIC's relinquished property) were then paid through escrow to the property seller as the equity payment or down payment on the property.[16] The deeds received by the TICs were subordinated to the mortgage deed securing the bank loan debt. Consequently, the FeeCo and the TICs stood in co-tenancy status with respect to their ownership interest in the investment property.

> (2) The OpCo LLC - whose membership was again a mix of Sunwest principals, served as the master tenant and leased the property from the FeeCo and the TICs, and then engaged SMI to actually operate the ALF

---

[16] The TIC interests were also held by TIC LLCs that were set up as part of the overall investment process.  The FeeCo and each of the TIC LLCs was set up as an SPE in order to satisfy bank secondary market securitization requirements set by the rating agencies. The TIC facility operator or master tenant LLC operating agreements also contained SPE provisions, but these agreements were not part of the marketing or sales documentation because the TICs were not part of the OpCo.

15

business on the property.[17] In exchange for their lease agreement, the TICs received annual "rent" payments, usually computed as being 10% of their principal investment amount, plus an additional 2% at the time of buyout. RT 386-387, 439. Following acquisition, the Sunwest business plan called for the property to be leased up until it could generate sufficient revenue to cover its debt and operational expenses. At such time as the property was leased up, the debt on the property would be refinanced and the TICs bought out.[18]

The government sought to prove that TIC investment funds had been diverted out of the ALF property acquisition escrows and used for other purposes, but this effort failed. RT 1406-1656.[19] After a TIC escrow closed, there were no TIC funds

---

[17]Section 1031 precludes an investor/taxpayer from being active in any business operation on the premises of a replacement property. RT 387. Consequently, the TICs could not be members of the OpCo. *Id*.

[18] A schematic of the FeeCo/OpCo structure is found in Defendant Exhibit 775, at p. 48 (ER 211). According to Thurber, the average occupancy of an assisted living facility industry-wide was approximately 90%. RT 422. Sunwest's average occupancy across its inventory of properties was approximately 75%. *Id*. Although facility occupancy rates were negatively suppressed by the downturn in the real estate market in 2006; properties acquired in the early 2000s were displaying an 88% occupancy rate and the Debt Service Coverage Ratio (DSCR) for the core portfolio was at 1.41. RT 451-53. These circumstances suggest that the key components of the Sunwest business plan were basically sound. *See* Defendant Exhibit 611, p. 2, ER 206.

[19] Defense expert witness, Forensic CPA Jeff Cone, criticized the government's position, as presented through Senior Bankruptcy Analyst Allen Painter, with respect to both its methodology ("pretty misleading") and the conclusions reached. RT 1959-65.

16

left over to be diverted. RT 2216; *see also Harder*, 116 F. Supp. 3d at 1226; ER 065 ("In the case of Sunwest, money from new investors was generally used as the down payment for a real estate purchase transaction, while the balance of the purchase price and additional funds for 'reserves' would come from an institutional lender.").[20]

### 4. The PMI Investment Structure.

The PMI investment involved the investor's acquisition of Class B shares in the LLC that owned the property. Although the PMI investors had no right of control over the activities of the owner of the property, as LLC members they stood in a fiduciary relationship with the members of the owner LLC. Moreover, the offering memoranda with respect to the PMI investments specifically assured the PMI investor that her funds would be used to meet build-out and other needs directly related to, and necessary for, the development of the property.

---

[20] Former Sunwest CFO Brody confirmed that TIC investor funds, as distinct from PMI investor funds, were consumed in the property acquisition:

> In many cases on the TIC investors specifically, when they would invest into - -a let's say we go to closing on a generic TIC property. Their funds would typically go into escrow and help close the transaction. There wasn't excess TIC funds in that type of a transaction.

RT 630-31.

5.    **Intercompany Loans.**

Clyde Hamstreet, a corporate recovery specialist who was hired by Mr. Harder as Sunwest's Chief Restructuring Officer (CRO) in the latter part of 2008 in an effort to keep the Sunwest businesses afloat, testified that Sunwest's accounting records disclosed the existence of hundreds of intercompany loans between the assisted living and other facilities that SMI had under management. RT 30-31. These loans were documented in Sunwest's accounting records:

> They documented everything. It wasn't just not kept track of. They kept good track of where the money went. But if one entity needed money to pay for the food because they didn't have enough money to cover its share, and another entity had a little extra cash, they would move the money from the unit that had the extra cash to the other one, loan it to them, and that entity would then make its share of food payments.

RT 31.[21] Hamstreet also testified that, given that the various LLCs involved in ALF ownership and operation were structured as SPEs, the intercompany lending violated the bankruptcy remote status that the SPE structure was intended to promote. RT 32.

_____

[21] The first CRO agreement between Hamstreet and Sunwest was dated November 20, 2008. Defendant Exhibit 881. A second CRO agreement was subsequently signed in December, 2008. RT 68-69; Defendant Exhibit 506. This latter agreement provided that Mr. Harder, along with Fisher and Gutzler, would cede and turn over to the CRO all rights and interest they might otherwise have to proceeds from the sale of Sunwest properties (i.e. the Lone Star sale). RT 69-70. The Lone Star sale consisted of a selection of high performing Sunwest properties with GE Capital mortgages that was finalized in early 2009. According to Hamstreet,

18

David Thurber, who joined Sunwest in 2005 as a Vice President of Investor Relations and later held the position of Senior Vice President of Marketing at CCF, was aware that facility shortages were handled by way of SMI's infusing funds into the facility.  RT 374. But Thurber claimed not to know that funds from one ALF facility were being used to cover the operating expense deficits of other ALF facilities.  RT 440.   Rather, it was his belief that funds used for this purpose came from the assets of the principals, not other ALF facilities:  "[T]here was always our understanding there were assets within the organization in which there were no TIC investors in which the principals had equity, from which they may draw money out to fund other assets that required funding." RT 374.[22] Thurber also testified that it

---

but for the availability of the Lone Star sale proceeds, "we would not have been able to restructure Sunwest." RT 51, 92. As a result of that restructuring, in Hamstreet's view, the recoveries ultimately obtained by the former Sunwest investors were "extremely high." RT 93.

[22] Thurber testified that the investors he spoke with thought that the notion their property would be supported by Mr. Harder and other Sunwest principals in the event of an operating revenue shortage was "a pretty good idea." RT 444. This testimony underscores the extent to which the § 1031 requirements were misunderstood by Thurber and others, including many of the TIC investors.  Direct infusion of money out of Mr. Harder's pocket, for example, and into a struggling facility was likely to be seen by the IRS as placing the TIC investors into a partnership relationship with Mr. Harder, a status specifically prohibited by 26 U.S.C. § 1031(a)(2)(D).

was his understanding that, in order to qualify for a §1031 deferral, the investment property had to be a Special Purpose Entity. RT 376.[23]

In his testimony, Mr. Harder recalled that intercompany lending and borrowing had been used to cover operating income deficiencies at Sunwest managed facilities as far back as he could remember, a circumstance that had been disclosed to the lender banks. RT 2003-04; 2141 ("The intercompany lending that we had – that we had done for the life of our business it was on all the balance sheets. It went to all the banks. It was very much disclosed."). It was his belief, based on the advice he received from his lawyers, that so long as the intercompany loans were documented, there was nothing wrong with the practice.[24]

---

[23] In articulating this belief, Thurber exposed his own lack of knowledge regarding IRC § 1031. There is no SPE status requirement among the 15 criteria identified by Rev. Proc. 2002-22 that mandates that the owner of a replacement property interest be an SPE. *See* Rev. Proc. 2002-22, 2002-14 I.R.B. 733, 2002-1 C.B. 733, 2002 WL 417295 (IRS RPR).

[24] In an effort to prove that Mr. Harder was deceitful, the government adduced an email in which Thurber had written that "Jon's bottom line was that we did not/do not use proceeds from one project for other unrelated projects." Government Exhibit 13; ER 181. However, Thurber made it clear in his testimony that in this email the "proceeds" referred to were the "TIC money in the projects." RT 456. Similarly, when confronted with Thurber's email, Mr. Harder explained that what he was communicating was that Sunwest did not utilize the TIC investment funds earmarked for one project in order to make payments or cover expenses associated with another project. RT 2103-04.

Mr. Harder did not view the interfacility lending as contrary to what investors were told. RT 2141. As late as 2003, intercompany loans had been viewed as a standard practice in the senior housing industry. RT 679-80. Furthermore, insofar as Mr. Harder had personally guaranteed many of the bank mortgages on the properties, it was not possible for him to simply take money from the ALFs and walk away from those properties. RT 2149.[25]

When Sunwest's acquisitions began to accelerate in 2006, the Sunwest inventory of facilities was below "a 1.0 debt service coverage ratio." RT 589.[26] Thus, according to Brody, "in order to meet the overall obligations, we had to continue with our intercompany loans." *Id.* However, the funds available to be transferred

---

[25]Brody testified that, in 2003, he tendered his resignation from Sunwest due to concerns he had with the intercompany loans. RT 577. Brody stayed on when Mr. Harder represented that he "was going to see if we could tailor them back." RT 578. Brody also testified that, in 2007 or possibly 2008, he and Mr. Harder created a "do not touch" list of facilities that were off-limits for purposes of lending funds to other Sunwest managed facilities. RT 582, 586. According to Brody, "[t]here were a handful of properties where we either had lender constraints, because the lenders made an issue or the partners had made an issue about intercompany loans, and that gave me a list of properties that I then communicated with both Mr. Dinh and Mr. Pearse with respect to intercompany loans." RT 582.

[26] Debt Service Coverage Ratio (DSCR) is the ratio of cash available for debt servicing to interest, principal and lease payments. It is a mathematical benchmark used to assess a business' ability to produce enough cash to service its debt. A DSCR over 1.0 means that the business generates sufficient cash flow to pay its debt obligations.

were not sufficient to meet all of Sunwest's accruing facility expenses and costs. Consequently, Sunwest experienced a negative cash burn that grew to $64 million by the end of 2007. RT 592; *see also* Government Exhibit 26 (ER 164).[27]

When ALF facility funds were not available to cover cash shortages, Mr. Harder would borrow money from third parties. On occasion, Mr. Harder would also borrow funds for use in the acquisition of non-senior housing assets. Over time, these debt obligations grew until the monthly payments on the notes memorializing these loans reached over $400,000 per month. RT 640-42. Although the government tried to characterize these note payments as simply benefiting Mr. Harder, *see* Government Exhibit 31 (ER 165-66), a significant portion of this debt related to money that Mr. Harder had reinvested into the ALF facilities or the Sunwest

---

[27] While use of TIC funds as mezzanine financing was a brilliant idea, it only worked if (1) the facilities involved leased up quickly so as to reach a DSCR of 1.0 or greater, and (2) institutional financing was available so that the debt load could be refinanced and the TICs bought out. Mr. Harder continued to acquire new facilities in 2006 through 2008 at a rapid rate, but when the facilities did not lease up, and when the capital markets dried up, the non-renegotiable TIC debt became a drag on Sunwest's economy, a drag that had a negative impact on Sunwest's overall financial wellbeing. As Mr. Harder noted, "We grew too rapidly, and I hold that on myself." RT 2043; *see also* Government Exhibit 1, Declaration of Clyde A. Hamstreet, at p. 5, ¶ 11, ER 154 ("Strong capital markets and easy financing aided Sunwest's growth. When the financing dried up, however, Company operations could not support guaranteed monthly payments to TICs.").

22

businesses. RT 643. [28] The payment of these notes was critically important because Sunwest's business model depended on Mr. Harder's credit worthiness and Sunwest's ability to refinance debt. RT 643-44.

### 6. Control of the Businesses.

According to in-house counsel Tom Wettlaufer, between 2003 and 2008, the critical business decisions were made by Mr. Harder. RT 776-77. However, Wettlaufer also stated that the construction and contents of the TIC/PMI investment packages had been delegated by Mr. Harder to his attorneys, inside and outside of Sunwest: "I can't say that he directed us on how the deal was structured. I think he left it to us, which was myself, Mr. Estes and Tim Dozois and Gib Masters to work on the structure of the deals put together." RT 777. Thus, although he retained final authority over most decisions, Mr. Harder entrusted his legal counsel with the preparation of the private placement memoranda and risk disclosures used in the Sunwest private placement investments. RT 799.

### 7. The Role Of The Attorneys.

Mr. Harder employed numerous attorneys at various skill and decision-making positions in the Sunwest business organization. Attorney Thomas Wettlaufer

---

[28] According to Brody, Mr. and Mrs. Harder loaned money they were entitled to receive back into the business and the Sunwest managed facilities. RT 678-79.

23

was hired at Sunwest in 2003 to perform transactional work and to assist in the acquisition of senior housing projects. RT 773-74. When Wettlaufer joined Sunwest, SMI General Counsel Wally Gutzler and attorney James Estes were already there. RT 774. Wettlaufer ultimately rose to the position of SMI Senior Vice President and Associate General Counsel.

In 2003, Sunwest's main outside law firm was Davis, Wright, Tremaine. RT 775. As the volume of investment sales activity grew, two additional outside law firms were brought into to handle the overflow – Gib Masters with K&L Gates and Thompson & Knight.

According to Wettlaufer, DWT attorney Dozois was "the primary outside counsel." RT 775. Dozois had an office at Sunwest headquarters in Salem. He worked at Sunwest two to three days a week, and spent 80 to 90% of his time on Sunwest matters. RT 2058.

### 8. The *Kraus* Litigation.

In 2003, Mr. Harder and SMI were sued by his then business partner, Jeff Kraus. Kraus's complaint was that Mr. Harder and SMI had transferred monies belonging to facilities in which Kraus had an ownership interest to other facilities in which Kraus had no interest. *Kraus et al. v. Harder,* No. 03-1198-MO, 2004 WL

24

716576 (D. Or. Mar. 31, 2004); ER 172.[29] Kraus sought a preliminary injunction against Mr. Harder's and SMI's continuing to transfer funds between Sunwest-managed homes. After an evidentiary hearing, Judge Mosman denied Kraus's request for injunctive relief. *Id.*

Judge Simon used the *Kraus* opinion as a template for his own understanding of Sunwest's business practices. In his Findings Of Fact And Conclusions Of Law, Judge Simon quoted from Judge Mosman's opinion:

> The court [Judge Mosman] further concludes that plaintiffs have submitted sufficient evidence to raise serious questions about defendants' performance of their fiduciary duties. *The court is most troubled by defendants' transferring homes' money without so much as informing the owners.* Plaintiffs' expert documented over $2 million in unauthorized transfers among the homes. *In essence the evidence showed that Sunwest treated the money in the transfer account as its own despite its officers knowing the money belonged to the retirement homes. Indeed the evidence showed that Sunwest's officers deliberately sought to conceal the transfers whenever it believed an investor such as Kraus might object.*

> *Kraus*, 2004 WL 716576, at *6 (emphases added) (footnote omitted).

---

[29] The self-serving nature of this lawsuit, and the role it played as a bargaining chip between two business men (Harder & Kraus) struggling for control of the then growing Sunwest business, is disclosed by Judge Mosman's finding that "[i]t is undisputed . . . that the plaintiff homes were net recipients of the intercompany transfers, receiving about $335,000 more than they purportedly lent out to other homes." *Kraus*, 2004 WL 716576 at *8, ER 195.

*Harder*, 116 F. Supp.3d at 1209, ER 032-33. The problem with Judge Simon's

reliance on the *Kraus* opinion is that the factual circumstances involved in the TIC

investment deals are significantly different from the partnership arrangements Mr.

Harder had with Kraus.  Not only did the *Kraus* case involve issues of fiduciary

relationship, but the funds involved consisted of monies belonging to (i.e. owned by)

the retirement homes, monies in which Kraus had a cognizable legal interest as a

member of the retirement home LLCs.[30]

---

[30] Judge Simon's failure to appreciate these distinguishing factors appears to have led him to accept government witness Lindell Van Dyke's contention that any and all monies associated in any way with an investment facility were "project monies" that had to stay with the facility. RT 1090-91.  Invoking a "good faith" theory, Van Dyke testified that in his view "[t]he basic obligation of all of these Sunwest entities, including the master tenant, is to utilize monies generated by this facility for the benefits of the facility." RT 1130-31. Van Dyke argued this contention despite the language of the master tenant agreement pertaining to his investment facility which stated, in relevant part, at Article III, Section 3.1:

> **The master tenant shall be entitled to all benefits of the operation of the property**, subject to the terms of the master lease, **including, without limitation, all gross income and cash flow from the operation of the property**.

RT 1129-30 (emphases added).  Van Dyke, an attorney specializing in real estate law, did not read through the offering memoranda and other materials pertaining to his investment. Instead, he relied on information communicated to him by his tax accountant, Steve Ghirado, and his broker, Tamara Sanner. RT 990. Apparently what really sold Van Dyke on the investment, the "selling point," was his being told that if there were any difficulties with his facility, Jon Harder and Darryl Fisher would "dip into their own pockets and make sure that everything was okay." RT 994, 998.

Following publication of the *Kraus* case decision, meetings were held with Sunwest personnel and Sunwest's lawyers to discuss restructuring of the investment package operating agreements to address Sunwest's interfacility lending practice. RT 785. However, no modifications to the operating agreements to address this practice were made until 2008. RT 785.[31] Mr. Harder testified that, at the time of the *Kraus* opinion, most of the operating agreements were between members of a group of individuals who knew one another and had been long term associates. Mr. Harder also recalled that the lawyers eventually told him the facility operating agreements did not need to be changed. RT 2163-64.[32]

---

In effect, Van Dyke invested not because he believed that all monies associated with the investment facility would be spent on the facility, but because there was no apparent risk associated with his investment given that Mr. Harder and Fisher would "make sure that everything was okay."

[31]In his Amended Findings of Fact, Conclusions of Law, Judge Simon remarked that in Brody's recollection the attorneys had counseled a change to the organizational documents and LLC management agreements, but that Mr. Harder's response was "either the lenders or partners – I believe the lenders weren't going for that." *Harder*, 116 F.Supp. 3d at 1210; ER 033. Brody admitted, however, that this was simply a passing comment, and that the inter-facility loans had been disclosed to the lender banks. RT 768.

[32] Although the Sunwest lawyers initially determined that the intercompany lending did not need to be disclosed to investors, this position subsequently changed. In January 2008, a Supplement No. 1 to Confidential Placement Memorandum was issued with respect to the West Salem Senior Living, LLC, PMI offering that disclosed the Sunwest practice of loaning money to and between affiliates. RT 780-

27

### 9.    The Investment Marketing Process.

The sales pitches made by Sunwest marketing personnel were low pressure. RT 429.  Moreover, the Sunwest investments were by design only to be offered to accredited investors. RT 423. The demand for replacement properties for investment funds seeking § 1031 coverage was so great that Sunwest did not have enough properties to place all the potential TIC investors. RT 433.

### a)    The Risk Disclosures.

The generation of risk disclosures pertaining to the Sunwest private placement investments was an ongoing process. Even into late 2007, and early 2008, Sunwest lawyers continued to devise disclosure provisions and to expand upon the risks the Sunwest investments posed and the financial condition of the businesses in general.

### b)    The Single Purpose Entity, Reserves, and the TIC Investor Rent Provisions.

The Sunwest marketing documentation, including the LLC operating agreements, represented that the investment facility was a single purpose entity. According to attorney Wettlaufer, all of the investment literature and the LLC

---

81; *see also* Government Exhibit 23, at p. 2 ("Reserves for the Project and other projects held by Sponsor were loaned to affiliates.").  ER 163.

operating agreements contained covenants that the investors' funds would not be used for purposes other than purposes related to the investment entity. RT 793.

Senior VP of Marketing Thurber confirmed that potential investors were told that the Sunwest investments involved "stand alone" facilities. RT 365. The sales pitch also included references to the setting aside of reserves to cover expenses until facility revenues picked up through the lease-up process. RT 365. With respect to the rent payments due investors, Thurber testified:

> We told them, unequivocally, that the property would sustain itself. To the extent that it didn't, the principals of the company would stand behind it and make their rent payment good.

RT 366.[33]

During the course of the May hearing, the government repeatedly attempted to demonstrate that the 'rents' paid to investors, and in particular the TIC investors, were expected to come only from the facility in which the TICs had invested. For example, the government pointed to language in the Operating Memorandum that stated that the "master tenant must be economically successful in order to pay your rent." RT 794; Government Exhibit 87, at p. 44, ER 178. However, this language

---

[33] Thurber testified that Mr. Harder was sometimes present when a sales pitch were made to an investor. RT 366. No recollection of a specific sales pitch event involving Mr. Harder was described by Thurber.

29

appears in the context of a risk disclosure in the Kansas City Senior Living Property, LLC, Confidential Offering Memorandum, dated April 17, 2007, to the effect that the "projected financial results of the Property may not accurately predict actual performance." *Id*. None of the PPMs issued by Sunwest (i.e. Canyon Creek Financial and Canyon Creek Development) explicitly state that the source of investor 'rent' was to be confined to revenue generated by the investment facility. RT 800-01.

With respect to funding reserves on the properties, the government claimed that Mr. Harder had "looted" the reserves of facilities and used those funds for purposes other than what they were earmarked for. But, as Attorney Dozois explained, this was unlikely given that, except in the instance of development or "dirt" deals, the banks held the reserves:

> THE COURT: Where and how does the reserve get created at the time of closing?
>
> THE WITNESS: At the time of closing the lender loans money to FeeCo. The only place the lender's money goes is to FeeCo. But with the lender's approval, FeeCo owes a portion of that money to the operating company so the operating company can both buy its personal property, and it can fund these operating reserves. So as a legal matter, that money belongs to the operating company. Obviously, it [borrows] it back, right. But it doesn't typically have the money. Typically the cash is actually held by the bank, and the operating company can only get the cash after it has satisfied the conditions for receipt of the cash. In other words, using the reserves we are most concerned with, it has to

30

have paid the rent to the TICs in order to ask for reimbursement and get the lender to pay them for that payment.

RT 1779-80, ER 352-53.

### c) Sales Representations.

The Sunwest investment documentation states that the investor is to rely solely on what is presented to him or her in writing, and not oral statements:

> No person has been authorized to make any representations regarding the Fee Interests other than those in this Memorandum. No additional oral or written representations should be relied upon.

Government Exhibit 87, Kansas City Senior Living Property, LLC, Confidential Offering Memorandum, dated April 17, 2007, at p. 29, ER 177. Later, in 2007, the warning regarding reliance on information not contained in the PPMs is repeated:

> No person has been authorized to make any representations regarding the FEE interests other than those in the Memorandum and this Supplement. No additional oral or written representations should be relied upon.

Government Exhibit 87, Kansas City Senior Living Property, LLC Supplement No. 1 To Confidential Offering Memorandum, dated June 22, 2007, at p. 1, ER 176.

Despite these express limitations on what the potential investor should rely on, many (if not the vast majority) of the Sunwest investors appear to have merely skimmed the offering memoranda, if they read the documents at all. Many investors, including investor Lloyd Hiebert, testified they were told by sales people – such as

31

Thurber, and Sunwest registered broker Alex Rhoten – that Sunwest was a financially successful company and they made their investments based on that information. RT 1877.[34]

The government presented summary testimony from FBI Special Agent Jerry Gorman concerning the representations made to potential Sunwest investors. The FBI's investigation of Mr. Harder began in November, 2008. RT 1232. All together the FBI interviewed 118 individuals who had invested with Sunwest during the time period 2006 through 2008. RT 1234; *see also* Government Exhibit 128 (ER 183).

According to Gorman, investors "were told they would be investing in [a] specific individual senior housing facility or property, and that it was common for them to be told that Sunwest was successful and a financial strong company." RT 1246. Many investors were told and understood that the property they invested in would stand on its own, and that the properties would be financially independent from other Sunwest properties. RT 1247-48. A number of individuals invested in

---

[34] Hiebert testified that this statement was made during a conversation with Thurber and Rhoten shortly before the settlement date of his investment, December 5, 2007. RT 1879. Hiebert also recalled that when he asked Thurber what would happen if one of the facilities in which he was investing did not do well, Thurber replied: "Don't worry. Jon Harder has enough net worth to handle any - - any financial emergency." RT 1877. Hiebert also claimed that he was told that his investment money, "and whatever reserves were being set up," would be used for the facility in which he had invested. RT 1880.

multiple properties in the belief they were diversifying their investments, believing that "because the properties were independent, because if one property failed, the others would still succeed, and that would somehow lessen the risk of making this investment." RT 1249.

A number of individuals interviewed by Gorman claimed "to have received assurances directly from Mr. Harder about the quality or safety of their investment." RT 1254. For example, Norma Bork, who invested $300,000 in Sunrise Creek on May 23, 2008, called Mr. Harder and spoke with him about her prospective investment. Bork told Gorman that Mr. Harder told her "this was an investment that he would put his own mother in." RT 1255.

Another investor, Lynn Henricksen, spoke with Mr. Harder several times before investing, and Mr. Harder told him that Mr. Harder would personally guarantee Henricksen's investment. RT 1256. In late 2007, Henricksen ultimately invested in the Clovis project, and he is the victim identified in Count 13 to which Mr. Harder pled guilty. RT 1257.

Of the investors interviewed, 98% stated they, in hindsight, would not have invested in Sunwest had they known of its overall financial condition at the time of their investment. RT 1275. Ninety-five percent of the interviewed investors stated

33

they would not have invested had they known that the reserves for particular projects were likely to be transferred or loaned to other projects or affiliates. *Id*.[35]

### 10. The Downfall.

#### a) The Economic Crisis.

As was the case with many high-growth businesses in the early to mid-2000s, Sunwest had a recurrent cash flow problem. In part, this problem was anticipated by the business plan which contemplated the purchase of under-performing properties that required an investment of time and money in order to lease them up and increase revenue. To address this problem, not only were funds transferred from facilities with cash to those that needed cash, but Mr. Harder also borrowed millions of dollars against his personal interests and assets.

The freezing up of the commercial lending markets following August 2007 exacerbated Sunwest's cash flow problems. By December 2007, Sunwest's situation from the standpoint of cash was dire. RT 2066. Consequently, in order to meet payroll and other obligations at the end of the year, Mr. Harder ended up "borrowing money from the Hobbs and Clovis deals." RT 2067.

---

[35] Gorman also related that most of the people interviewed had not read the Sunwest private placement memoranda. RT 1236, 1403. What most of the interviewed investors did rely on was the offering summary. RT 1247; *see also* Government Exhibit 97 (ER 179).

Mr. Harder did not notify the Hobbs and Clovis PMI investors that he was using their money to cover Sunwest's payroll and other expenses. RT 2067. A portion of the Hobbs and Clovis project money was placed in the JMH account and used to pay Mr. Harder's business notes and personal obligations. RT 2067-68. Mr. Harder testified, with respect to the situation in December 2007, "I was desperate." RT 2068. However, Mr. Harder also admitted that he did not tell investors post-December 2007 that the cash situation at Sunwest had become dire. RT 2176-77.

**b)    GE Capital.**

Mr. Harder had a lengthy relationship with GE Capital. Richard Arrowsmith, a special assets workout officer employed by GE Capital Healthcare Financial Services, testified that he first interacted with Sunwest personnel in 2005 when he contacted Sunwest in an effort to sell senior residential living properties that had been foreclosed on by GE Capital. RT 110.

Subsequently, Mr. Harder obtained a number of loan packages from GE Capital that facilitated the acquisition of properties and the refinancing of existing mortgage loans for better terms. However, as noted by Arrowsmith, the GE Capital loan documents required that the borrower entity (or borrower entities in cross-collateralized loan packages) maintain SPE status. The GE Capital Loan documents

35

also contained a number of negative covenants, including a covenant prohibiting the commingling of funds. RT 115.

In the fall of 2007, GE Capital acquired the commercial healthcare industry lending arm of Merrill Lynch Financial Services. Sunwest had a significant financing relationship with Merrill Lynch, and when the GE Capital / Merrill Lynch acquisition closed in February of 2008, the Sunwest loan balance held by GE Capital approached $600 million. RT 123-24.

From a historical standpoint, Mr. Harder had experienced technical performance covenant issues with lenders before 2006. However, technical defaults had not been a significant issue prior to the summer of 2007. RT 2050. With respect to GE Capital, Mr. Harder recalled that in 2007 Sunwest management had missed some performance covenants on GE loan package properties and that GE Capital wanted a meeting in Chicago in August of 2007. RT 2053.

Mr. Harder and other Sunwest principals met with GE Capital personnel in August, 2007. GE Capital demanded a $3 million forbearance penalty for rolling the tripped covenants forward a year. RT 2053. From Mr. Harder's perspective, GE Capital's position with respect to the missed performance covenants was extremely arbitrary; however, in September, Sunwest paid the $3 million forbearance fee to GE Capital. RT 2054.

In December 2007, or possibly early January, 2008, Arrowsmith and other GE Capital personnel flew out to Salem to meet with Mr. Harder to discuss the Sunwest loan situation. RT 148. On the second day of that meeting trip, Arrowsmith went out to Mr. Harder's residence where he saw a lot of construction going on. RT 125-26.

On February 28, 2008, GE Capital sent a letter to Sunwest noting that there were covenant violations with respect to the group of assisted living facility properties known as the Carolina 7 and declaring a loan default. RT 239, 2070. GE Capital demanded that the covenant violations be remedied and that Sunwest pay forbearance fees in an amount of $14 to $15 million. RT 2070. GE Capital also required Sunwest to take on a restructuring or turnaround adviser. RT 2072. Ultimately, Alvarez & Marsal was chosen to fill this role.

Alvarez & Marsal personnel began their work at Sunwest in March, 2008. Within a few weeks, the Alvarez & Marsal accountants had conducted an analysis that showed that Sunwest was suffering a cash burn rate of many millions of dollars each month, a burn that was projected to approach $9.9 million a month by the end of May, 2008. Government Exhibits 4 & 5.

### c)     The Gib Masters Letters.

In late 2007, Gib Masters of K & L Gates became aware that funds invested in several Sunwest development deals had been loaned to other facilities. RT 781-82. On January 17, 2008, Masters met with Wettlaufer and Dozois to discuss the situation and formulate a remedy.  On January 18, 2008, Masters sent a letter to Sunwest recounting what had taken place at the meeting. Government Exhibit 67; ER 170.  In his letter, Masters noted that Wettlaufer had confirmed that "reserves funded with the proceeds from equity sales to investors related to the development projects had been loaned to affiliates." *Id*., at p. 2; ER 171. The letter further memorialized the agreement reached between Sunwest and Masters' firm, K & L Gates, whereby Sunwest agreed that development deal funds, which had previously been deposited in Sunwest's bank account, would henceforth be held in separate bank accounts:

> Although Jon would prefer that development and contingency reserves be permitted to be loaned among affiliates with full disclosure and consent from investors, we agreed at our meeting that funds should remain segregated in separate accounts.

Government Exhibit 67 at p. 2, ER 171.  Wettlaufer, with the assistance of Dozois, responded to the Master's letter by correspondence on January 30, 2008, affirming that no further lending would be undertaken with respect to the development deal

properties. RT 788; Defendant Exhibit 734, ER 207. This representation was not borne out by subsequent events.

### d) Harder's State of Mind in 2006-2008, and His Efforts to Sell the Portfolio.

As of 2006, Mr. Harder's perception was that the Sunwest business plan was being executed and the facility inventory was continuing to grow in value. RT 2044, 2049 ("We were gaining equity. We were gaining value – values in senior house."). In late 2006, Mr. Harder sought to place the Sunwest facility inventory up for sale. RT 2058, 2060. Initially, Mr. Harder picked Cohen & Steers for the purpose of advising him with respect to the sale of Sunwest properties because Cohen & Steers and Bank of America had been the lead financial advisors on the Holiday sale. RT 2059.

In the spring of 2007, Tony Crooks of AEW came out to Oregon. He and Mr. Harder drove around looking at Sunwest facilities. RT 2064. Although Crooks' examination of the Sunwest facilities was restricted to Oregon, he advised Mr. Harder that his price, were he to buy, would be in the $160,000 per unit or door range. RT 2064.

Mr. Harder then engaged CBRE and David Rothschild to take the Sunwest inventory into the market. Initially the plan was for Rothschild to take the Sunwest

inventory into the marketplace in May or June of 2007. However, in July of 2007 Rothschild advised Harder that in light of the current economic situation in the CMBS market, it would be preferable to wait a couple of months before they launched what was subsequently called the Diamondview facilities sale package. RT 2066.

The Diamondview package went to market in early 2008, but did not sell. RT 1291-92. A decision was then made to repackage the properties having a minimum occupancy of 80%. RT 1297-98. This sale package became the Treadstone package. *Id.* In marketing this package, Rothschild targeted a per door or unit price of $140,000 - $150,000. RT 1302. When this package did not sell, a final effort was made to market premium properties where GE Capital was the mortgage holder. This became the Lone Star sale which involved approximately 3600 units. This sale was successful at a per door price of $103,000. RT 1302.

In early 2008, Richard Graham of Green Park Financial, a commercial loan direct underwriting service, approached Mr. Harder and suggested that Mr. Harder work with him and Green Park to obtain financing from Fannie Mae and Freddie Mac. RT 2073. In Mr. Harder's view, had the Green Park financial underwriting activity borne fruit, it would have been transformational for Sunwest. RT 2089-90. On May 29, 2008, Mr. Harder and a team of Sunwest personnel met with Richard

Graham and representatives of Fannie Mae and Freddie Mac. At the conclusion of these meetings, Mr. Harder was encouraged that some form of financing relief would be available. RT 2092-93.

On May 30, 2008, Mr. Harder and several other Sunwest principals along with Matt Marcos of Alvarez & Marsal met with Richard Arrowsmith and GE Capital. RT 2093. Arrowsmith testified that the people from Sunwest present at this meeting were Mr. Harder, Fisher, Mike Deines, Brody, and outside counsel Bobby Guy. RT 128.

At this meeting, a report prepared by Alvarez & Marsal for GE Capital was discussed. *See* Government Exhibit 5. This report disclosed that "[h]istorically, Sunwest has had a cash burn of approximately $5 to $6 million a month, and that, "[i]n recent months, the cash burn has increased to approximately $10 mm/month." The report concluded that Sunwest "is in a liquidity crisis," but that "Sunwest can be restructured into a viable go-forward enterprise," and that if "the initiatives to improve cash flow are successful, Sunwest should reach breakeven by the end of the year." Government Exhibit 5, at pp. 3, 5, and 17 (ER 155-158).[36]

---

[36] Arrowsmith claims that at the New York meeting he "went around the room and told all those guys they ought to get criminal defense lawyers." RT 129. He did

41

After the meeting with GE Capital, Mr. Harder was "devastated." RT 2093. He was personally concerned because many of his family members and friends were involved in Sunwest investments. RT 2093-94. Unfortunately, there was no source of rescue on the horizon, and in June, 2008, Sunwest issued a letter to its investors advising that the rent payments had been suspended.[37]

By this point in 2008, the "debt markets were closing." RT 2095. GE Capital's approach was to force facilities into bankruptcy in a manner that would result in the TIC investors losing their money. RT 2095. Eventually, the Carolina 7 group of Sunwest ALF facilities was placed in bankruptcy and then sold "through a 363 sale." RT 2096.

Mr. Harder always saw tremendous value in the Sunwest business concept, the management company itself, and the facilities. Indeed, Government Exhibit 133 shows reserves still available to Sunwest as of June 30, 2008, in the amount of $94,221,952. RT 2105. These were lender-held reserves. RT 2105.

Mr. Harder also sought to protect the TIC investors from the disastrous effects of bankruptcy. In early 2008, Mr. Harder hired Fil Agusti and the firm of Steptoe &

---

this because "I wasn't going to get paid on loans that I had made that were money good loans because they were going to steal my money." RT 129.

[37] *See* Government Exhibit 48, ER 167-69.

Johnson to assist him in his struggle with GE Capital. Counsel from Steptoe & Johnson determined that the only way out for Sunwest was to place all the properties in bankruptcy. Steptoe & Johnson wanted a $35 million retainer fee to represent all of the properties in bankruptcy. RT 2097. From Mr. Harder's perspective, the advice of the Steptoe & Johnson lawyers was to undertake actions with respect to the properties that would have resulted in the destruction of the TIC investors' interests. RT 2097-98. Mr. Harder fought against that approach.

Mr. Harder's attempts to put together a sales package of Sunwest properties concluded with the Lone Star sale package. RT 2098. When this sales package went through, the resulting funds enabled the CRO and the Receivership to stabilize the company and conduct an organized sale of assets that resulted in an unparalleled recovery for the Sunwest investors. RT 1185-86, 1302.[38]

**Standard of Review**

In the plea agreement, the parties agreed that the determination of the scope of the scheme to defraud was a factual one, and that the standard of review on appeal from the District Court's decision of this issue is the clearly erroneous standard. CR 109, pp 9-10; ER 90-91. In accordance with this standard, a "definite and firm

---

[38] The Receivership was imposed by judicial order following the initiation of SEC litigation against Mr. Harder and SMI in March of 2009.

conviction" that a mistake was committed below is a prerequisite to appellate reversal. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

**Custody/Bail Status/Release Date**

Mr. Harder is in the custody of the Bureau of Prisons and serving his sentence at FCI Lompoc. His projected release date is March 19, 2029.

## SUMMARY OF ARGUMENT

Despite loss estimates exceeding $300 million, investment sales to over 1000 investors, and the existence of multiple Sunwest vertically integrated corporate entities employing numerous individuals, only a single individual, former SMI CEO Jon Harder, was selected by the government as its prosecution target after Sunwest's collapse in 2008. In the government's eyes, neither the CFO of Sunwest, Curtis Brody, nor the COO of Sunwest, Daryl Fisher, nor the principal architect of the investment structures marketed by Sunwest, DWT attorney Timothy Dozois, bear any responsibility for the scheme to defraud alleged against Mr. Harder.

During the course of the lengthy Phase I evidentiary hearing, testimony was received from Mr. Harder and others that he had delegated responsibility for the

preparation of the Sunwest investment packages to his in-house and external counsel, and that he had no involvement in putting together the TIC and PMI investment structures that the Amended Indictment declares to have been fraudulent. This is not an instance of failed advice of counsel. Rather, the facts of record disclose that Dozois and other lawyers were in complete control of the very process that Judge Simon found to have worked an ongoing fraud on more than a thousand investors over a period of many years.

In order to find Mr. Harder culpable for the scheme to defraud alleged against him in the Amended Indictment, Judge Simon had to find that he intentionally and deceptively made statements, or omitted disclosures, in order to obtain investment funds. Mr. Harder has acknowledged that the Sunwest investment documents failed to adequately notify potential investors about Sunwest's use of assisted living facility revenue and, on occasion, reserves, to meet the operating expenses of under-performing facilities. But Mr. Harder has also steadfastly maintained his innocence of any intent to deceive the Sunwest investors in order to seize control of their investment funds.

Judge Simon found Mr. Harder culpable for fraud while ignoring completely the testimony received during the May hearing concerning the extent to which Mr. Harder had entrusted his attorneys to make the decisions requisite to lawful

45

marketing of the Sunwest private placement investments. This finding of culpability is "clearly erroneous" because the proven facts do not support an inference that Mr. Harder acted with an intent to deceive his investors into parting with their funds, and because Judge Simon ignored the role played by DWT attorney Dozois and other lawyers in the structuring and sale of the Sunwest investments that the Amended Indictment characterizes as fraudulent.

The conclusions reached by Judge Simon are further undermined by his failure to address and ameliorate the impact of hindsight bias on the determination of the scope of the scheme to defraud issue. "Research on human judgment suggests that people cannot ignore a known outcome when assessing an event's likelihood – a phenomenon known as 'the hindsight bias.'"[39] Thus, hindsight bias describes an individual's "projection of new knowledge into the past accompanied by a denial that the outcome information has influenced his judgment."[40] The presence of

---

[39] Kim A. Kamin & Jeffrey J. Rachlinski, *Determining Liability In Hindsight*, Law and Human Behavior, Vol. 19, No. 1 (1995), 89-104.

[40] Scott A. Hawkins & Reid Hastie, *Hindsight: Biased Judgments Of Past Events After The Outcomes Are Known*, Psychological Bulletin, Vol. 107, No. 3 (1990), 311-27. In their review article, Hawkins and Hastie note: "[M]ajor laboratory studies of hindsight phenomenon show[] that there is a substantial, reliable effect of outcome information on subsequent judgments, even when the subject is given unambiguous instructions to ignore the outcome information." *Id.* at p. 314.

hindsight bias in judges has also been shown and studied, and judicial hindsight bias has been found to be more intractable to correction than juror hindsight bias.[41]

Judge Simon received numerous letters from irate former Sunwest investors prior to and during the Phase I Hearing. Despite Mr. Harder's objection, and in direct contravention of the judicial duty to maintain the appearance of justice, Judge Simon read the letters thereby subjecting himself to being influenced by the numerous disparaging comments and accusations contained in those letters. By failing to counter the influence of hindsight bias, and by reading the former Sunwest investor communications during the fact-finding Phase I Hearing, Judge Simon denied Mr. Harder the central benefit for which he had negotiated in agreeing to plead guilty – i.e. a full and fair hearing and determination as to the government's proof of the scope of the scheme to defraud.

---

[41] Anderson et al., *The Mitigation Of Hindsight Bias in Judges' Evaluation Of Auditor Decisions*, 16 Auditing: A Journal Of Practice And Theory, 20, 21-23 (1997). *See also* Baruch Fishoff, *For Those Condemned To Study The Past: Heuristics and Bias in Hindsight*, in Kahneman, Slovic & Tversky, *Judgment Under Uncertainty: Heuristics And Bias* (Cambridge Univ. Press, 2005), 335-511.

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN FINDING THAT MR. HARDER FORMED AN INTENT TO DEFRAUD THE SUNWEST TIC AND PMI INVESTORS AS ALLEGED IN THE AMENDED INDICTMENT.

### A. The Nature Of The Scheme To Defraud.

At Mr. Harder's change of plea hearing, AUSA Garten advised the Court that the government's proof of the scheme to defraud rested on three separate, but inter-related, materially false representations:

> Essentially, Your Honor, the government will show that the defendant made three materially false misrepresentations. **One, that all the investors' money would go into a specific facility; 2) that the profits from that facility would pay the rents for the returns to these investors, and 3) that all their money would stay with the facility in which they had invested.** None of that was true. The government will show that, in fact, the SunWest enterprise was hemorrhaging cash and losing money hand over fist and, by the end, to the tune of $10 million a month, **the government would show that at least as far back as 2006, and earlier, that all the money was co-mingled and that none of the money stayed with an individual facility**.

RT 41-42 (emphases added). While this overview of its intended proof was consistent with the allegations set forth in the Amended Indictment, *see* Amended Indictment, at pp. 2, ¶ 3, p. 7, ¶ 16(a), ER 094, 099), it is a far cry from what was actually submitted to and found by Judge Simon as a matter of fact.[42]

---

[42] For example, as noted ante at pp. 16-17, AUSAs Garten and Kerin sought to convince Judge Simon that Mr. Harder had facilitated the transfer of TIC

**B.** **The Key Factor In The Scheme To Defraud Determination Is Whether Mr. Harder Formed An Intent To Defraud And, If So, When.**

One of the bedrock principles of our system of criminal justice is that, with rare exceptions, "wrongdoing must be conscious to be criminal." *Morissette v. United States*, 342 U.S. 246, 252 (1952). Proof of a defendant's specific intent to defraud or deceive is requisite to proof of the existence of a scheme to defraud under both the mail and wire fraud statutes. *United States v. Jinian*, 725 F.3d 954, 966 (9th Cir. 2013) (wire fraud); *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984) (mail fraud); *see also United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980) (specific intent proven if "scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension"); *Irwin v. United States*, 338 F.2d 770, 773 (9th Cir. 1964) (scheme to defraud is a "scheme reasonably calculated to deceive

---

investment funds out of the property acquisition escrows and used them for purposes inconsistent with the explicitly designated use of those funds – acquisition of the property. RT 1031. The government failed in this effort, but it left Judge Simon confused as to the status of ALF facility revenues following acquisition. The requirements for a § 1031 deferral of capital gains tax investment are clear – the investor cannot claim any right or entitlement to revenues generated by any business operated on the investment property, but only to the rent or lease payments owed by the business. Testimony at the Phase I Hearing established that the TIC investor funds, as generated by the sale of their relinquished property investments, were used in the manner conveyed by the PPMs – as the equity portion of the property acquisition funds.

persons of ordinary prudence and comprehension"). Thus, to prove a scheme to defraud, the government must prove that the perpetrator of the scheme specifically intended "to deprive one of something of value through a misrepresentation or other similar dishonest method . . . ." *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012).[43]

Specific intent can be established by circumstantial evidence. *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) (holding that misrepresentations and omissions are sufficient to support an inference of intent to defraud). And the scheme itself may be probative circumstantial evidence of intent to defraud. *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). However, it is not sufficient for purposes of finding that a scheme to defraud existed for the government to simply prove a defendant's making of some misrepresentations or omissions of fact; rather, there must be evidence of planning activity on the part of the alleged perpetrator. *Goodman*, 984 F.2d at 237; *see also United States v. Brien*, 617 F.2d 299, 307 (1st

---

[43] Mail fraud requires that the government prove "the existence of a plan or scheme to defraud, that it was foreseeable that the scheme would cause the mails to be used, and that the use of the mails was for the purpose of carrying out the fraudulent scheme." *United States v. Goodman*, 984 F.2d 235, 237 (8th Cir. 1993). To hold an individual accountable for concocting a mail fraud scheme it is incumbent on the fact finder – jury or judge – to find that the mailing was "part of the execution of the scheme **as conceived by the perpetrator** at the time.". *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (emphasis added).

50

Cir. 1980) ("The essence of a scheme is a plan to deceive persons as to the substantial identity of the things they are to receive in exchange.").

An omission, as distinct from an affirmative obligation, can also violate the federal fraud statutes, but "only in the context of a duty to disclose." *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000).[44] A duty to disclose can, however, "arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading," even in the absence of a relationship giving rise to fiduciary duties. *Id*. As the Fourth Circuit observed in *United States v. Colton*:

> [E]ven in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to "prevent[ ] the other [party] from acquiring material information."

231 F.3d 890, 898 (4th Cir. 2000) (brackets and ellipsis in original.). Although a simple failure to disclose a pertinent fact does not constitute fraud, under the common law affirmative attempts at concealment – that is, "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent

---

[44] The Ninth Circuit has observed that "a non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir.1984), *rev'd on other grounds*, 473 U.S. 207 (1985).

further inquiry into a material matter" – can constitute common law fraud. *Id*. at 899; *see also Neder v. United States*, 527 U.S. 1, 22 (1999) (noting that "the well-settled meaning of 'fraud'" includes "concealment of material fact"); *but cf. United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012) ("[W]e agree with the district court that 'in order for a fraudulent disclosure to be actionable fraud (either criminal or civil) the duty to disclose must be independent of any duty imposed by contract.").

In *Valansi v. Ashcroft*, the Third Circuit observed that "the common meaning of the term 'defraud' is 'to take or withhold from (one) some possession, right, or interest by calculated misstatement or perversion of truth, trickery, or other deception.'" 278 F.3d 203, 210-11 (3d Cir. 2002) (quoting *Webster's Third New International Dictionary* at 593). Thus, proof of fraud requires the identification of intentional conduct on the part of a perpetrator that impairs the rights of others to their funds or property. Loss, however, in an absolute sense is incidental to the crime and need not be proven. *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958) ("Success of the scheme is not essential to completion of the offense.")

Fraud, at common law, "included a scheme to deprive a victim of his entitlement to money." *Pasquantino v. United States*, 544 U.S. 349, 356 (2005). Such a scheme can arise even though the money or property involved was lawfully obtained by the perpetrator of the scheme. *Carpenter v. United States*, 484 U.S. 19,

27 (1987) ("The concept of 'fraud' includes the act of embezzlement, which is 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.'"). Fraudulent appropriation as the basis for a federal fraud charge was recognized by the Ninth Circuit in *United States v. Jones*, 472 F.3d 1136, 1140 (9th Cir. 2007).

One can also intentionally deprive another of money or property, for purposes of the federal fraud statutes, "while at the same time intending to restore it at a later date." *United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 2010). Irrespective of whether § 1341 requires proof of a specific intent to harm another by way of such deprivation, the Ninth Circuit has held that harm sufficient to sustain a fraud conviction is caused when an individual is deprived of the opportunity to determine the degree of risk he or she is willing to take when entrusting their funds to another:

> Whether or not § 1343 requires that the deprivation involve an "intent to harm" - and we express no opinion on that issue - our present holding is entirely consistent with such a requirement. The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes "harm" by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property.

*Id*. at 997.

In his Amended Findings of Fact and Conclusions of Law, Judge Simon found that Mr. Harder "acted knowingly and with the purpose and intent to deceive Sunwest's investors and deprive them of the opportunity to weigh not only the benefits but also the risks of the investment transactions they were undertaking." *Harder*, 116 F. Supp.3d at 1225, ER 061. However, at no point in his opinion does Judge Simon point to evidentiary facts disclosing Mr. Harder's formation prior to 2006 of a "plan" to defraud Sunwest's potential investors, nor is there any finding that Mr. Harder knowingly sought out others in order to formulate and then implement a fraud scheme.

Judge Simon based his determination concerning the scope of the fraud scheme on six distinct "material misrepresentations, misleading half-truths, and omissions" that he attributes to Mr. Harder. *Id*. The common thread linking these six examples is (1) the failure to disclose "the pervasive practice of intercompany transfers," and (2) the failure to disclose that Sunwest had a negative monthly cash burn of $5-6 million from 2006 on. *Id*.[45] The problem with Judge Simon's approach

---

[45] The sixth representation identified by Judge Simon as being false or misleading was that the TIC investments qualified for § 1031 capital gains deferral. According to Judge Simon, this representation was misleading given the manner in which SMI managed the ALF facilities "(i.e. as a 'unitary enterprise')," and consequently "the Internal Revenue Service either would disallow Section 1031 tax-deferred treatment or there was at least a substantial risk of that occurring." *Harder*,

54

is that (I) it assumes the very point that it seeks to prove – that Mr. Harder was acting

with the intent to deceive prior to 2006, (II) it completely ignores the testimony of

attorney Dozois with respect to both (1) and (2) above, and (III) it fails to identify

the date or time period when the alleged scheme commenced.[46]

According to Judge Simon, "Harder had the intent and purpose for deceiving

the investors by keeping material information from them." *Id*. at 1226. Judge Simon

appears to have reached this conclusion solely because the practice of intercompany

lending and the financial condition of the Sunwest businesses were not disclosed to

---

116 F.Supp.3d at 1225-26, ER 062. No expert witness testimony was received in support of this point, nor does the Amended Findings of Fact and Conclusions of Law opinion cite any case or statutory law in support of this point. Indeed, Judge Simon's own observation of the facts of record paints a very different picture:

> I do accept that for all these TIC investors, the trade blotter will show that they received what they were expecting to receive in terms of their percentage of interest in the TIC property and that they most likely received a deed **and that they never heard anything from the IRS that there were any disallowance of the 1031 treatment**.

RT 1600 (emphasis added). No witness testified that they encountered tax issues or disallowance of their § 1031 tax deferral planning based on the structure of their investment or SMI's management of the investment property.

[46] The only reference to a time period in Judge Simon's Findings of Fact and Conclusions of Law is the conclusory statement, "Beginning at least by 2006 . . . Harder . . . intentionally and knowingly engaged in a scheme to defraud . . . ." *Harder*, 116 F. Supp. 3d at 1227, ER 064.

potential investors. No testimony or evidence was offered during the Phase I Hearing as to statements made by Mr. Harder disclosing such an intent, or as to actions performed by Mr. Harder prior to December 2007 from which such an intent might reasonably be inferred. Nor was any testimony received to the effect that Mr. Harder actively sought to conceal facts from the Sunwest investors. *Cf. Colton*, 231 F.3d at 899 (describing "active concealment, which involves the requisite intent to mislead by creating a false impression or representation"). Indeed, the testimony of record was to the contrary – Harder's basic instruction to the lawyers was "let's do it right." RT 1824.[47]

---

[47] In articulating the grounds for the sentence he imposed on Mr. Harder, Judge Simon attempted to neutralize the role played by DWT attorney Dozois and others: "Although Harder argues that he relied on sophisticated legal counsel to ensure that he complied with all laws, there was no evidence presented that any attorney ever advised Harder to mislead or deceive anyone." *Harder*, 2015 WL 7288903 *5 (D. Or. 2015, CR 207, p. 11 (Sentencing Memorandum and Order). In taking this position, and ignoring the pivotal role of Dozois and his law firm in all aspects of the Sunwest investment marketing program, Judge Simon aligned himself with the organized bar's traditional stance against any suggestion that lawyers should be held accountable for their involvement in the marketing of securities on behalf of corporate clients. *See* Susan P. Koniak, *When The Hurlyburly's Done: The Bar's Struggle With The SEC*, 103 Colum. L. Rev. 1236 (2003) (Discussing the organized bar's resistance to SEC rules seeking to impose some accountability on lawyers for disclosing the fraudulent activities of their corporate clients, and noting that the "bar's law has constructed a world in which lawyers believe it is their duty to contort law to meet the client's ends."); Robert J. Rhee, *The Madoff Scandal, Market Regulatory Failure and the Business Education of Lawyers*, 35 J. Corp. L. 363, 365

**C.** **Judge Simon's Failure To Comment On The Testimony Of DWT Attorney Dozois With Respect To Responsibility For Failing To Disclose Sunwest's Intercompany Lending And Its Cash Burn Problem Raises Due Process Fair Sentencing Concerns.**

The "attorney is the field marshal of the disclosure process."[48] DWT Attorney Dozois testified at length concerning his oversight responsibility for the preparation of the Sunwest offering memoranda and risk disclosures.[49] Indeed, Dozois affirmatively told Judge Simon that with respect to disclosure of both the intercompany lending and the financial condition of the Sunwest businesses, the buck stopped at his door:

> THE COURT: Well, wouldn't it have been material to tell the investors that intercompany lending had in fact taken place in the past? It very well may take place in the future. And if in the future those intercompany loans are unable to be paid off, that may affect the availability of funds to do this project.
>
> THE WITNESS: Ultimately, we agreed with you, which is why you are going to see that kind of disclosure in the offering memorandum in 2008. Prior to that time, given what we knew about the net worth of Jon Harder, Darryl Fisher, the equity that was built up in the properties,

---

(2009) ("Among the many leitmotifs of the financial crisis is the failure of lawyers as regulators and gatekeepers.").

[48] John C. Coffee, *The Attorney As Gatekeeper: An Agenda For The SEC*, 103 Column. L. Rev. 1293, 1312 (2003).

[49] Attorney Dozois' complete May hearing testimony is contained in the Excerpts of Record at ER 245-443.

we were worried about the other side of the equation, which is if you talked about this, that you were going to give these investors the idea that they were going to saved, right. They were going to get bailed out by property B that was going to loan money and if your property, your operator doesn't make it. We didn't want to give rise to any implied promise that they had something else to rely on.

RT 1817, ER 390.

When Judge Simon inquired whether Mr. Harder played a role in making the decision, prior to late 2008, not to disclose the historical practice of intercompany lending and that intercompany lending might continue, Dozois responded: "No. And at no time did he tell us not to disclose that. That was a lawyer-driven decision by a committee all of us, including CCF, J&L, Davis Wright Tremaine." RT 1818. ER 391. Judge Simon then asked Dozois a critical follow-up question:

> THE COURT: Did those lawyers factor in the *Kraus* decision and the comments from Judge Mosman that I just read to you?
>
> THE WITNESS: We did factor that in, yes.

RT 1818, ER 391.[50]

---

[50] Early on the civil proceedings, Mr. Harder admitted that the practice of intercompany lending was "central to Sunwest's business model." *Harder*, 116 F.Supp.3d at 1222, ER 056. Scoping in on this admission, Judge Simon writes:

> If a single entity owns multiple facilities, there is nothing improper, let alone fraudulent, with that entity borrowing "excess cash" from one of its facilities and then lending it to another of its facilities, provided that such a practice is not inconsistent with any representations made to the owners of that entity or to any of its creditors (including lenders, who

58

Judge Simon also engaged in an extended discussion with attorney Dozois concerning the need to disclose the cash burn that Sunwest experienced in 2006 through 2008:

> THE COURT:     Wouldn't that be a significant risk factor that should have been disclosed to the prospective investors in 2006, 2007, and 2008?

---

may have covenants in relevant loan documents that prohibit such a practice). **That is the lesson that one would have thought Harder had learned from the *Kraus* litigation in 2004**.

*Id*. at 1222-23, ER 057 (emphasis added). If "Sunwest's lead outside counsel, Mr. Dozois" (*Harder*, 116 F.Supp.3d at 1216) did not learn the "lesson" Judge Simon distilled from the *Kraus* opinion, is it really fair to fault Mr. Harder for not getting it? Moreover, Mr. Harder was not the only Sunwest principal to come away with a different read of the result in *Kraus*. CFO Curtis Brody, for example, testified that Judge Mosman's *Kraus* opinion "basically emboldened us and solidified the fact that we were doing intercompany loans . . . ." RT 756. Brody also testified that, following issuance of the *Kraus* opinion, there was no discussion among the principals about concealing the intercompany loans, and that "all loans were . . . presented on the balance sheet.". RT 757-58. Likewise, attorney Dozois' understanding of the *Kraus* opinion was far different from that articulated by Judge Simon:

> When the Kraus situation happened, and having been the one who structured and implemented the entire settlement of that deal, my understanding was that the legal department educated Jon that you can't just willy-nilly move money around. **We have got to document it properly. We have got to account for it on the books. That's what emerged from that. That's the lesson that emerged**.

RT 1808, ER 381 (emphasis added).

THE WITNESS: A debate that raged internally amongst us lawyers constantly. At the end of the day, our decision was: These investors are buying a piece of property. They aren't buying property A, B, and C over here that are having a negative cash flow. The issue is, what are they buying? They are buying a property and is it -- with the projections that hopefully have been professionally prepared by Mike Deines and his team -- does it look like property is viable, both with this operating tenant or with an alternative tenant? And if the answer is yes, then all of this other stuff that's going on over here really shouldn't matter.

THE COURT: Now, let's combine those two points: On the one hand, you don't disclose to them that there is intercompany lending going on. On the other hand, we know that there is significant negative cash flow going on, and you decide not to disclose that because they are only buying one piece of property, and we don't care about what is happening systemwide. Well, now, you combine it together. Don't we have a very serious risk factor; namely, even though the projections for this particular property might be going very well, we aren't going to disclose to you that there is intercompany lending going on, and we're not going to disclose to you that enterprise-wide there is significant negative cash flow?

Dozois' response to Judge Simon's summary was that he was correct, and that ultimately those risk disclosures came out in 2008. RT 1821-23, ER 394-96.

In concluding that the scheme to defraud extended beyond the counts of conviction, Judge Simon found that in failing to disclose the intercompany lending and the cash flow troubles faced by the Sunwest businesses, Mr. Harder committed fraud:

Without these disclosures, however, there was pervasive fraud committed on the Sunwest investors, including the TIC facility investors, the TIC development ("bare land" or "dirt deal") investors,

60

and the PMI development investors (beyond merely Clovis and Hobbs). Because Harder knew that these material misrepresentations, misleading half-truths, and omissions were occurring and were indeed part of the Sunwest standard "sales pitch," and because Harder controlled all material aspects of Sunwest's operations, including CCD and CCF, **and because Harder has the intent and purpose of deceiving the investors by keeping material information from them** in order to obtain their investments, **Harder had the requisite mens rea (or criminal intent or state of mind) to be held responsible for this pervasive fraud**.

*Harder*, 116 F. Supp.3d at 1226, ER 062-063 (emphases added). This conclusory statement is defective because it assumes as one of its cornerstone propositions the very fact sought to be proved – i.e. Mr. Harder's intent. It also completely ignores attorney Dozois' testimony that Mr. Harder never interfered with the disclosure drafting process or rejected a disclosure proposal. RT 1824.[51]

---

[51] In addition, at no point in his opinion does Judge Simon address the forensic report submitted by Forensic CPA experts Howard Silverstone and Jeffrey T. Willoughby (and received as testimony, RT 667-68) that questioned the specific time frame for disclosure of Sunwest's financial troubles:

> Given the time frame necessary to bring all properties to an appropriate net operating income level, the expected financial performance of the company, the improvement in the financial performance from 2007 to 2008, and the recommendations from Alvarez and Marsal, the need to notify investors of any financial struggles would have occurred in late 2008 and may not have been necessary until later in 2009, consistent with the two-year turnaround time period necessary for the underperforming facilities.

Defendant Exhibit 503 at pp. 10-11 (ER 199-201).

61

Mr. Harder did not just receive advice from the lawyers engaged and employed by Sunwest, he turned over to those lawyers complete responsibility for creation of, and oversight over, the Sunwest investment program. Judge Simon's failure to even refer to attorney Dozois' testimony in this regard, or to explain why he ignored it, discloses a fundamental weakness in the reasoning he employed in finding that Mr. Harder "had the requisite mens rea (or criminal intent or state of mind) to be held responsible for this pervasive fraud." *Harder*, 116 F. Supp.3d at 1226, ER 063.

The plea agreement in this case was discussed with Judge Simon on a number of occasions, and the two phase hearing process was accepted by him. Judge Simon well understood that his decision of the scope of the scheme to defraud issue would have a significant impact on Mr. Harder's sentence. At a minimum, Mr. Harder had a due process right to have Judge Simon implement the hearing process procedure in a manner which would enable him to give effective consideration and attention to all aspects of the history involved in Sunwest's marketing of investments. *Cf. United States v. Tavano*, 12 F.3d 301, 305 (1st Cir. 1993) ("[A] court must take pains to base sentencing judgments upon reliable and accurate information."). By ignoring attorney Dozois' testimony with respect to the key decisions that resulted in the misrepresentations and omissions identified by Judge Simon, Judge Simon failed to

accord Mr. Harder the due process he was entitled to receive. *Cf. Townsend v. Burke*, 334 U.S. 736, 741 (1948)("[T]his prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law . . . .").[52]

## II. BY READING LETTERS SUBMITTED TO THE COURT CONCERNING ISSUES SUBJECT TO RESOLUTION DURING THE PHASE I HEARING, JUDGE SIMON VIOLATED MR. HARDER'S ENTITLEMENT TO A PROCEEDING BEARING THE APPEARANCE OF JUSTICE.

### A. Criminal Prosecutions Are A Component Of Public Governance, Not Private Vengeance; It Is Therefore Critical That The Appearance Of Justice Be Preserved.

The principle that "justice must satisfy the appearance of justice" is a proposition deeply rooted in the common law of the United States. *Levine v. United States,* 362 U.S. 610, 616 (1960). Equally important to the integrity of the criminal justice system is the requirement that the prosecutor seek to satisfy the public

---

[52] *Townsend* is usually cited as standing for the proposition that a criminal case defendant has a due process right to be sentenced on the basis of accurate information. To insist that due process also requires that relevant information be considered by a sentencing judge, and not overlooked or intentionally set to the side, is consistent with that proposition given that the ultimate due process entitlement at sentencing is fairness. *United States v. Watson*, 1988 WL 101634 *2 (E.D. La. Sept. 28, 1988) ("Due process protects a defendant's right to a fair sentencing, particularly the right to be sentenced on the basis of accurate information.").

governance interests of all parties before the court, and not the private interests of specific individuals. *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 814 (1987) ("For this reason, we must have assurance that those who will wield [prosecutorial powers] will be guided solely by their sense of public responsibility for the attainment of justice."); *see also Berger v. United States*, 295 U.S. 78, 88 (1935).

### B. The Court's Consideration Of Victim Impact Letters During The Phase I Hearing Interfered With Mr. Harder's Due Process Rights.

Judge Simon first brought up the issue of his reading letters he had received "from the public" concerning Mr. Harder's case at a status conference on May 6, 2015. RT 4. At that time, Judge Simon had received "approximately 35 or so letters from the public," and it was his inclination to read them before the Phase I Hearing started. RT 4-5. Objection to Judge Simon's reading of the letters in advance of the Phase I Hearing was advanced on the grounds that (1) the majority of the letters were aggressively antagonistic to Mr. Harder, (2) there was no way for defense counsel to assess the impact that reading the letters would have on Judge Simon, and (3) to the extent that reading the letters involved Judge Simon's receipt of untested information, it was not in conformity with the appearance of justice for him to read the letters prior to completing the Phase I Hearing. RT 67-68, 75-76. The

government opposed Mr. Harder's objection, and urged Judge Simon to read the letters, claiming that the "victims" had a right to speak. RT 76-77.

On May 12, 2015, at the commencement of the Phase I Hearing, Judge Simon announced that "my decision is, I will read [the letters], and I have read them."  RT 6-7.[53]  On May 20, 2015, further discussion occurred concerning an email sent by Judge Simon suggesting that he wanted to question Mr. Harder about three letters he had received.  RT 2080-81; ER 445-46.  Although an objection was noted, the government contended that Mr. Harder had no confrontation rights with respect to information received by the court in the sentencing context. RT 2081-82. The government further argued that, in accordance with the Crime Victim Rights Act, 18 U.S.C. § 3771, Judge Simon was entitled to review the letters. RT 2083.

In response to defense counsel's concerns, Judge Simon stated he was not affected by his "skimming" of the letters. RT 2087. However, he examined Mr. Harder with respect to allegations contained in three of the letters that Sunwest investments had been sold to unaccredited investors, and that Sunwest had

---

[53] Although there were some letters which supported Mr. Harder, the vast majority castigated him for causing the losses the investors sustained as a result of Sunwest's implosion.  A sampling of the investor letters is contained in the Excerpt of Record at ER 221-242.

represented that the ALF investment facilities would be SPEs. RT 2168, 2169, 2170-72.

Judge Simon's review of the Sunwest investor letters raises troubling due process concerns with respect to the influence of those letters on the decision he had agreed to make in the Phase I Hearing:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness:
>
> Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter the due process of law. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."

*In re Murchison*, 349 U.S. 133, 136 (1955) (citations omitted); *see also Liteky v. United States*, 510 U.S. 540, 548 (1994) (considering judicial recusal and stating that "what matters is not the reality of bias or prejudice but its appearance").

Mr. Harder acknowledges that the Phase I Hearing was part of the sentencing process. But this circumstance should not result in diminishment of the protections due a defendant in a fact-finding proceeding. At a minimum, Mr. Harder had the same due process rights as any defendant at sentencing. *See United States v. Mezas*

66

*de Jesus*, 217 F.3d 638, 642 (9th Cir. 2000) (noting that "due process protects a defendant's interest in fair sentencing"). Like all other defendants, he had a right to "thorough adversarial testing" of information reviewed by the court for sentencing. *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Abreu*, 202 F.3d 386, 391 (1st Cir. 2000) ("While evidentiary rules at sentencing may be relaxed, sentencing is still an adversarial proceeding. . . ."). Moreover, while hearsay evidence may be used at sentencing, the Ninth Circuit requires that some minimal indicia of reliability accompany a hearsay statement. *United States v. Huchins,* 53 F.3d 276, 279 (9th Cir. 1995).

A defendant retains a due process right not to be sentenced on the basis of materially incorrect information. *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir.), *amended* 992 F.2d 1015 (9th Cir. 1993). The letters sent to the court contain a number of inaccuracies. For example, many investors wrote that Mr. Harder was using their money to pay for his defense or that they heard Mr. Harder had off-shore accounts and was using his family to hide money. Other investors wrote that Mr. Harder continued to live a lavish lifestyle after Sunwest imploded, in contrast to the sacrifices the investors had been forced to make.

The letters also contain emotional and inflammatory stories of the losses sustained by the investors due to the collapse of Sunwest. Undoubtedly most of the

67

investors suffered, to varying degrees, from the demise of Sunwest. However, the issue before the court in the Phase I Hearing was a pure question of fact – Did Mr. Harder commit the scheme to defraud alleged against him in the Amended Indictment?

By reviewing the Sunwest investor letters before and during the Phase I Hearing, Judge Simon communicated to Mr. Harder that he was willing to receive *ex parte* communications concerning the events that led to Sunwest's demise irrespective of how inflammatory, unbalanced, or flat out wrong those communications might be. Judge Simon's decision to receive highly prejudicial and untested evidentiary communications from third parties not before the court was (and is) inconsistent with the appearance of justice and rendered the Phase I Hearing fundamentally unfair.

### C. The Government Improperly Encouraged Investors To Contact The Court Before They Were Found To Be Victims.

In April, 2015, defense counsel raised, via a letter to the court, concerns that the government's communication with the victims was causing a number of victim impact letters to be sent to the court prematurely. ER 212-15. It appeared that one Sunwest investor was acting as a liaison between the government and numerous investors. On March 3, 2015, this investor authored an e-mail to a list of "Sunwest

68

Investors" stating that she had "just" spoken with the Assistant U.S. Attorney and he "is hoping that 200 of us show up on May 12th and beyond. He said the judge will be VERY swayed by the number of us who show up and care about this sentencing. It will be very hard for the judge to give him a light sentence with masses of us in the room." ER 216. This investor went on to write that AUSA Garten told her "IT'S ESSENTIAL THAT AS many of us as possible WRITE TO Judge Michael Simon . . . . EVERYONE needs to send a letter. [The AUSA] Alan said the number of letters the judge gets (he will read every one of them) the greater the impact on Harders [sic] sentence." ER 216 (emphases in original).

The Crime Victims' Rights Act (CVRA) affords crime victims the "right to be reasonably heard" at sentencing. 18 U.S.C. § 3771(a)(4). This includes the right to be heard either through speaking at sentencing or through a letter presented to the court. *Kenna v. U.S. District Court for C.D. California*, 435 F.3d 1011, 1016 (9th Cir. 2006) (interpreting CVRA). A prerequisite of being entitled to CVRA rights is that someone be a victim of the defendant being sentenced. *See, e.g.*, 18 U.S.C. § 3771(3) (defining "crime victim" as a "person directly and proximately harmed as a result of the commission of a Federal offense . . . .").

In Mr. Harder's case, the purpose of the Phase I Hearing was to determine the scope of the scheme to defraud. If Judge Simon found that the fraud was as extensive

69

as the offense described in the Amended Indictment, many of the letter writers would qualify as victims. However, if Judge Simon found that the fraud was limited to the counts Mr. Harder had already pled guilty to, then many of the letter writers would not have possessed a CVRA right to be heard with respect to Mr. Harder's sentence.

Judge Simon could easily have delayed review of the letters until after the conclusion of the Phase I Hearing. By reviewing the letters prior to making a finding as to the extent of the fraud scheme, he placed his own imprimatur of approval on AUSA Garten's conduct in urging that a letter writing campaign be conducted with respect to Mr. Harder' sentencing proceedings.

By first agreeing to the two-step sentencing process set forth in the plea agreement, and then campaigning to bring public pressure to bear on Judge Simon's decision in the Phase I Hearing, the government undermined the integrity of the agreement it made with Mr. Harder. When this circumstance is conjoined with Judge Simon's decision to read the letters despite defense counsel's objection, the resulting distortion in the appearance of justice denied Mr. Harder his due process entitlement to a fair sentencing proceeding.

## III. CONCLUSION

The Amended Indictment describes three specific acts of wrongdoing involving investor funds that it attributes to Mr. Harder: (1) the TIC "investors' money in a particular ALF was commingled with investments from all investors in all ALFs"; (2) the TIC investors were told that their rents would be paid from the positive cash flow of their investment ALF facility, and no other source; and (3) Mr. Harder commingled "investor funds from the numerous ALFs into commingled bank accounts which would then be used for operational purposes of all ALFs . . . ." However, (1) and (3) were not proven given that the TIC investors' funds were used in the manner the PPMs described as acquisition equity. Some testimony was received in support of (2), but no such representation is to be found in the PPMs.

In 2008, Mr. Harder made statements to investors concerning his perception of Sunwest as a successful business at a time when such confidence was misplaced, and he was clearly aware and in charge of the intercompany lending system that Sunwest employed to keep all of its facilities operating. But on what evidentiary basis did Judge Simon find that Mr. Harder had, at some specific and earlier point in time, conceived the scheme which Judge Simon found to exist?

After hearing Mr. Harder's testimony, Judge Simon stated that, "because of the underlying value in the portfolio, that you believed and didn't really anticipate

71

things would go as bad as they did. I get that. I hear you saying that." RT 2176. Mr. Harder was a businessman. He built Sunwest from the ground up and it became for a time a very successful venture. In late December 2007, Mr. Harder took and used PMI monies to meet Sunwest payroll and other needs he was not entitled to meet by using those funds. In doing so, he violated fiduciary obligations he owed to his fellow LLC members (the PMI investors). Continuing into 2008, Mr. Harder continued to take investor monies notwithstanding Sunwest's dire cash flow position, and Mr. Harder admitted to Judge Simon that he failed to notify potential investors of Sunwest's financial crisis. RT 2176-77. But prior to December, 2007, there is no document, no statement, and no disclosure by a hostile witness, that in any way supports the contention that Mr. Harder knowingly set about to deceive potential Sunwest investors.

The defense position before the court in the Phase I Hearing was not that Mr. Harder relied on the advice of his lawyers; rather, it was that Mr. Harder had turned over full responsibility for all aspects of the Sunwest investment marketing program to his lawyers. It was the lawyers – and principally attorney Dozois – who made the critical decisions as to (1) what was to be gleaned from the *Kraus* decision, (2) what potential investors were to be told about the intercompany lending, and (3) what would be revealed about the over-all financial condition of the Sunwest businesses

72

and affiliates. Attorney Dozois' unrebutted testimony was that these decisions fell on the shoulders of the lawyers, on his shoulders. Judge Simon's Amended Findings of Fact, and Conclusions of Law offers no explanation for his decision to ignore attorney Dozois' testimony.

Mr. Harder submits that Judge Simon's Amended Findings of Fact and Conclusions of Law pertaining to the scope of the scheme to defraud are not based on an accurate finding of facts. Moreover, by reading the Sunwest investor letters during the Phase I Hearing, Judge Simon undermined the appearance of justice, rendering the hearing fundamentally unfair. The Judgment and the sentence imposed below should be vacated, and this matter should be remanded to the District Court for a redetermination of the scope of the scheme to defraud and for resentencing.

Respectfully submitted this 22nd day of July, 2016.

*/s/ Christopher J. Schatz*
Christopher J. Schatz

*/s/ Robert B. Hamilton*
Robert B. Hamilton

*/s/ Emily Elison*
Emily Elison

Attorneys for Defendant-Appellant

73

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **CA No. 15-30359** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JON MICHAEL HARDER,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |

———————————

**STATEMENT OF RELATED CASES**

———————————

    I, Christopher J. Schatz, undersigned counsel of record for defendant-appellant, Jon Michael Harder, state pursuant to the Ninth Circuit Court of Appeals Rule 28-2.6, that I know of no other cases that should be deemed related.

    Dated this 22nd day of July, 2016.

                          */s/ Christopher J. Schatz*
                          Christopher J. Schatz
                          Attorney for Defendant-Appellant

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **CA No. 15-30359** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JON MICHAEL HARDER,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |

_____

## CERTIFICATE OF COMPLIANCE

_____

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

1.     This brief contains 17,778 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2013, 14 point Times New Roman.

Dated this 22nd day of July, 2016.

 _/s/ Christopher J. Schatz_____
Christopher J. Schatz
Attorney for Defendant-Appellant

75

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2016, I electronically filed the foregoing Opening Brief of Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Sandra L. Showard*
Sandra L. Showard