# No. 15-30359

# In the United States Court of Appeals for the Ninth Circuit

————————

UNITED STATES OF AMERICA,
*Appellee*

v.

JON MICHAEL HARDER,
*Appellant*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

————————

BRIEF FOR THE UNITED STATES

————————

BILLY J. WILLIAMS
  United States Attorney
  District of Oregon

KELLY ZUSMAN
  Assistant United States Attorney
  Appellate Chief
  District of Oregon

LESLIE R. CALDWELL
  Assistant Attorney General

SUNG-HEE SUH
  Deputy Assistant Attorney General

SONJA M. RALSTON
  Attorney, Appellate Section
  Criminal Division
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Suite 1264
  Washington, DC 20530
  (202) 532-6047
  sonja.ralston@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ...................................................... 1

INTRODUCTION .............................................................................. 1

STATEMENT OF THE CASE ............................................................. 2

    I.    Harder's Multi-Million-Dollar Fraud ........................................ 3

        A.    Sunwest's original "legitimate business model." ............... 3

        B.    "[I]f the court thinks that these investors risked their retirement on the basis of getting a warranty deed…, then I have a bridge to sell." ........................................ 8

        C.    "There is no word to even explain how inconsistent this is." ................................................................. 12

        D.    Disclosure was "the lesson that one would have thought Harder had learned." ....................................... 15

        E.    Harder lived a "big lifestyle." ........................................ 17

        F.    "The worst crisis I had ever seen." ................................. 18

        G.    For Harder, multiple offers to buy Sunwest "w[ere] not high enough." ................................................. 21

        H.    "[E]verything I've worked for is gone." ......................... 23

    II.    Procedural History ................................................................. 23

        A.    Harder pleaded guilty to defrauding the PMI investors ............... 23

        B.    The district court found Harder's "pervasive fraud" encompassed all investors. ............................................. 25

        C.    The court sentenced Harder to the plea agreement's maximum. ......................................................... 27

i

III.    The Court Received and Read Letters from the Public During Phase I ................................................................................. 28

IV.    Rulings Under Review ................................................................. 29

SUMMARY OF ARGUMENT ................................................................. 29

ARGUMENT ........................................................................................... 32

I.    The District Court's Finding Regarding the Scope of Harder's Scheme Is Not Clearly Erroneous .............................................. 32

    A.    Standard of review ............................................................ 32

    B.    The facts support the court's opinion. ............................. 32

    C.    The district court adequately considered Dozois's testimony. ......................................................................... 39

II.    The District Court Did Not Abuse Its Discretion in Reading Public Letters During Phase I of Harder's Sentencing Hearing ............. 42

    A.    Standard of review ............................................................ 42

    B.    The court acted properly because the letters raised relevant issues. .................................................................. 42

    C.    The process the court employed was fair. ....................... 45

    D.    The government followed the CVRA. ............................. 47

CONCLUSION ....................................................................................... 49

STATEMENT OF RELATED CASES ..................................................... 50

CERTIFICATE OF SERVICE ................................................................. 51

CERTIFICATE OF COMPLIANCE ....................................................... 52

# TABLE OF AUTHORITIES

## CASES:

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)................................................32, 40

*E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891 (9th Cir. 1994) ................................. 43

*Farrow v. United States*, 580 F.2d 1339 (9th Cir. 1978) (en banc) ..................................... 43

*In re K.K.*, 756 F.3d 1169 (9th Cir. 2014).............................................................. 48

*Irwin v. United States*, 338 F.2d 770 (9th Cir. 1964)............................................. 33

*Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011 (9th Cir.), subsequent mandamus proceeding, 453 F.3d 1136 (9th Cir. 2006) .............................................. 47

*Kraus v. Harder*, No. 03-1198-MO, 2004 WL 716576 (D. Or. Mar. 31, 2004)........ 15, 35

*Rita v. United States*, 551 U.S. 338 (2007) .............................................................39, 46

*Schmuck v. United States*, 489 U.S. 705 (1989) ..................................................... 34

*United States v. Alameda Gateway Ltd.*, 213 F.3d 1161 (9th Cir. 2000)............................. 41

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000)................................................37, 38

*United States v. Bailey*, 444 U.S. 394 (1980)......................................................... 39

*United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979)....................................33, 37

*United States v. Bischel*, 61 F.3d 1429 (9th Cir. 1995)......................................... 43

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) ...................................40, 42

*United States v. Christensen*, 732 F.3d 1094 (9th Cir. 2013)................................. 48

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000) ......................................... 38

*United States v. Davis*, 508 Fed. App'x 606 (9th Cir. 2013) ................................. 43

*United States v. Dowling*, 739 F.2d 1445 (9th Cir.1984), *rev'd on other grounds*, 473 U.S. 207 (1985)................................................................................................. 37

*United States v. Green*, 745 F.2d 1205 (9th Cir. 1984) ............................................. 33, 34, 35

*United States v. Jones*, 472 F.3d 1136 (9th Cir. 2007) .............................................. 37

*United States v. Laurienti*, 731 F.3d 967 (9th Cir. 2013) ......................................... 42, 45, 46

*United States v. Lee*, 648 F.2d 667 (9th Cir. 1981) ........................................... 43, 44, 45, 49

*United States v. Littlesun*, 444 F.3d 1196 (9th Cir. 2006) ...................................... 43

*United States v. Mikaelian*, 168 F.3d 380 (9th Cir.), amended, 180 F.3d 1091
(9th Cir. 1999) ................................................................................................... 46

*United States v. Oren*, 893 F.2d 1057 (9th Cir. 1990) ............................................. 34

*United States v. Ornelas*, 828 F.3d 1018 (9th Cir. 2016) ......................................... 42

*United States v. Rangel*, 697 F.3d 795 (9th Cir. 2012) ......................................... 39, 48

*United States v. Rivera*, 825 F.3d 59 (1st Cir. 2016) .............................................. 32

*United States v. Sandoval-Orellana,* 714 F.3d 1174 (9th Cir. 2013) ................................ 40, 41

*United States v. Sullivan*, 522 F.3d 967 (9th Cir. 2008) ......................................... 32

*United States v. Tavano*, 12 F.3d 301 (1st Cir. 1993) ............................................. 40

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010) ............................................. passim

*United States v. Tucker*, 404 U.S. 443 (1972) ...................................................... 42

*United States v. Tulaner*, 512 F.3d 576 (9th Cir. 2008) ......................................... 32

*United States v. Vanderwerfhorst*, 576 F.3d 929 (9th Cir. 2009) ............................... 44, 45, 48

*United States v. Wynn*, 684 F.3d 473 (4th Cir. 2012) ............................................. 33

*Western Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280 (9th Cir. 1984) .............. 39

## STATUTES AND RULES:

18 U.S.C. § 2........................................................................................ 2

18 U.S.C. § 1341 ................................................................................. 2

18 U.S.C. § 1343 ................................................................................. 2

18 U.S.C. § 1957 ................................................................................. 2

18 U.S.C. § 3771 ....................................................................31, 42, 47

U.S.S.G. § 6A1.3(a)........................................................................... 43

## OTHER AUTHORITIES:

Black's Law Dictionary (10th ed. 2014)............................................. 1

## JURISDICTIONAL STATEMENT

Defendant-appellant Jon Michael Harder appeals his sentence. The district court (Simon, J.) had jurisdiction under 18 U.S.C. § 3231. The court entered judgment on November 17, 2015, and Harder filed a timely notice of appeal on November 30, 2015. ER 7-8.[1] This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1. Whether the district court clearly erred in its sentencing determination regarding the scope of Harder's fraud.

2. Whether the district court abused its discretion in "skimming" victim impact letters to determine their relevance to the first part of a two-part sentencing hearing.

## INTRODUCTION

From 2006 to 2008, Harder and his company, Sunwest, sold two types of investments in senior-housing facilities: preferred membership interests (PMIs) (a type of equity in a corporation) and tenant-in-common (TIC) shares in real property.[2] Harder pleaded guilty to defrauding certain PMI investors by using the money they invested for different purposes than what he told them when they invested, but argued

---

[1] ER refers to Harder's Excerpts of Record. SER refers to the Government's Supplemental Excerpts of Record.

[2] A tenancy in common is the default mode of joint property ownership in which "two or more persons [own property], in equal or unequal undivided shares, each person having an equal right to possess the whole property but no right of survivorship." TENANCY, Black's Law Dictionary (10th ed. 2014).

1

that the TIC investors were not defrauded because they received the deeds he promised them. After a two-and-a-half-week hearing, the district court found that Harder's scheme to defraud included the TIC investors as well as the PMI investors.

The court based this conclusion on the testimony of former Sunwest employees and investors, all of whom explained that Sunwest and its affiliates marketed the two types of investments identically. This marketing pitch involved a series of misrepresentations about how Sunwest would operate its facilities that both PMI and TIC investors found material. In particular, the TIC investors were adamant that although they were purchasing an interest in real property, they were doing so because of the way Sunwest promised to operate the facility, which would generate the rent they were owed. Accordingly, the court's conclusion was correct.

## STATEMENT OF THE CASE

In May 2014, a federal grand jury in the District of Oregon charged Harder with 56 counts of mail or wire fraud (in violation of 18 U.S.C. §§ 1341, 1343, 2) and money laundering (in violation of 18 U.S.C. §§ 1957, 2). ER 93-122. Following a guilty plea pursuant to a plea agreement, Harder was convicted of one count each of wire fraud (Count 13) and money laundering (Count 51), relating to PMI investments to develop facilities in Clovis and Hobbs, New Mexico. ER 82-84. After an evidentiary hearing, the district court found that Harder's scheme to defraud extended beyond those two investments and encompassed every Sunwest investment, PMI and TIC, from 2006 to

2008. ER 64-66. The court sentenced Harder to 15 years' imprisonment, to be followed by three years' supervised release. ER 2-3.

## I.   Harder's Multi-Million-Dollar Fraud

When it began in 1991, Sunwest Management Inc. (SMI) managed a handful of nursing homes in Oregon. By the time of its collapse in 2008, the Sunwest enterprise (Sunwest) encompassed hundreds of companies including SMI, 294 assisted living facilities in 37 states, dozens of non-senior housing properties (including undeveloped land), and various service-providing affiliates. This meteoric rise—topping out at an acquisition rate of roughly one new facility every week in 2006 and 2007—resulted in a precarious structure. To keep the enterprise afloat, Sunwest engaged in the pervasive commingling of assets through loans from one facility to another ("inter-facility lending"). Time and again, Harder misled potential investors about this practice, among other things, to keep the cash flowing. When the global financial crisis tightened credit markets, Sunwest's instability became patent, and hundreds of investors lost millions of dollars as the house of cards Harder led them to believe was rock solid came tumbling down.

### A.   Sunwest's original "legitimate business model."[3]

As originally conceived, SMI was a closely held private corporation that sought to acquire underperforming senior-housing facilities and turn them around through its

---

[3] ER 56 (district court).

3

management expertise. *E.g.*, SER 886-887. By 2000, Sunwest controlled 20 properties, each owned by a partnership drawn from a few dozen people, all of whom personally knew Harder. ER 30; SER 584. During this time, Sunwest was more or less successful in its mission. SER 435-436. But Harder had bigger dreams; he wanted a company to rival Holiday Retirement, then one of the largest players in the industry. SER 1301, 1317-1318.

This ambition received a boost when, in 2002, the IRS issued a revenue ruling clarifying how to defer capital gains taxes on a real-property sale by executing a like-kind exchange under 26 U.S.C. § 1031. SER 367-368. This clarification led to a sharp increase in investors seeking § 1031 exchanges. ER 256, 280. To qualify, the property owner had to buy similar real property; a partnership or personal property did not count. SER 367-368, 857-858. The investors who sought § 1031 exchanges with Sunwest owned commercial real estate—ranging from "a laundromat to a trailer park to an apartment complex," SER 367-368—and needed to receive, under § 1031's terms, a deed in other commercial real estate. *E.g.*, SER 1203, 1690 (doctor's office); ER 269. Most were selling their property because they were ready to retire and were looking for a safe, passive investment to finance the next stage of their lives. *E.g.*, SER 1006, 1690. The tax code also required them to act quickly: they had only 45 days from the first property's sale to identify the new property. SER 858.

Sunwest took advantage of this increased demand for ready-to-sell § 1031 exchanges by using investors as "mezzanine financing" to grow its empire. ER 261.

4

The TIC investors provided the equity capital to purchase a senior-housing facility as tenants-in-common with Sunwest, Sunwest secured a mortgage, and SMI then operated the facility. SER 1444-1446.

Over time, and at least by the scheme's starting date in 2006, Sunwest altered the structure of its TIC deals to better comply with § 1031. For each TIC deal, Sunwest created two separate limited liability corporations, an operating company (OpCo) and a title-holding company (FeeCo). SER 398-400. The FeeCo owned property as a tenant-in-common with the investors, each of whom received a warranty deed for a share of the property, and the tenants-in-common collectively leased the property to the OpCo as the "master tenant," which promised to pay the TIC investors 10 percent annual rent. *Id.* The OpCo also purchased the facility's personal property and hired SMI to run the facility. *Id.* This structure insulated the TIC investors from any ownership in the management company or of non-real property. *Id.*

Because the facilities Sunwest acquired had low occupancy rates and were not profitable, Sunwest needed cash to improve the facilities and market them to increase occupancy. SER 1729. Sunwest got this money from bank mortgages: each loan included a traditional mortgage (*i.e.*, money paid to the seller at closing) as well as operating reserves. *See* SER 925-926; ER 64. To protect the bank's investment, the loan agreement with the OpCo included various "bankruptcy remote" provisions. ER 300;

5

SER 42, 125-126.[4] Two of those provisions required the OpCo to operate as a single-purpose entity (SPE)—that is, as a stand-alone facility not financially entangled with any other entity—and prohibited the OpCo from taking on additional debt. *E.g.*, SER 2262. These restrictions were repeated in the OpCo's operating agreement. *E.g.*, SER 2444-2446. Some of the promises that comprised SPE status included those not to "engage in any business … other than the … Project," not to "make any loan or advances to any Person," to "pay its own liabilities," and not to "commingle … its funds or other assets with those of any other Person." *Id.*

Although Sunwest completed many TIC deals from 2006 to 2008, it also "sold two other types of investments, both of which involved purchasing undeveloped land (referred to, on occasion, as 'bare land' or 'dirt' deals)," intending to build a new facility. ER 45. These dirt deals were structured both as PMI deals, in which investors bought shares in a company, and as TIC dirt deals that did not qualify as § 1031 exchanges because they involved investing in the land's development rather than merely owning the land. *Id.*

In addition to the OpCo and FeeCo for each TIC property, Harder created several affiliates to run the Sunwest enterprise. Canyon Creek Development, in which

---

[4] Sunwest worked with various lenders, some of which were more demanding than others, but these conditions appeared in most loan documents and operating agreements, regardless of the specific lender. SER 128, 802-803, 877, 1631-1632; ER 300.

Harder had a 60 percent stake, identified potential facilities for purchase. ER 31. Senenet provided staffing for all SMI ventures; Encore Indemnity provided the enterprise's insurance; and KDA Construction performed construction for Sunwest as well as Harder's other investments. *Id.* Finally, in 2005, Harder created and wholly owned Canyon Creek Financial (CCF) to market investments in Sunwest properties. *Id.*

CCF became a registered broker-dealer with the Securities and Exchange Commission (SEC), and Harder, as its head, also obtained a securities license. ER 31; SER 367. The licensing exam tests knowledge of disclosure requirements and the concepts of materiality and suitability. SER 365-366, 871. Furthermore, due to the investment's nature, SEC rules limited CCF's marketing only to accredited investors— people with more than a $1 million in net worth or annual income above $300,000. SER 1956. CCF, however, inappropriately accredited some investors who did not qualify, a fact that outside counsel Tim Dozois did not know. SER 1233; ER 328.

Although Harder hired people to help him run Sunwest, he retained final decision-making power. SER 587, 791-792. He decided which facilities to acquire, which banks to use, and how to structure each deal. SER 599-600. Harder ran the enterprise like "a sole proprietorship," SER 600-601, and was a "hands-on" manager, SER 778, 1404. Despite Sunwest being a multi-million-dollar enterprise, Harder tracked "a laundry list of essential sources and uses of cash" by hand in a Franklin Day Planner that accompanied him everywhere. SER 601-602.

B. <u>"[I]f the court thinks that these investors risked their retirement on the basis of getting a warranty deed…, then I have a bridge to sell."[5]</u>

Although CCF accurately informed investors of each deal's structure (PMI/TIC/dirt deal), CCF sold every investment with the same sales pitch, which featured six interlocking representations. *See* ER 61-62; SER 474, 556, 803, 1219, 1251, 1698; *see also* SER 621 (Sunwest did not distinguish operationally among projects based on their financing method).

First and most importantly, CCF told investors that each facility "would sustain itself," SER 379, and their investment would rise or fall based on how that particular facility performed. ER 61; SER 807-809, 1212. *But see* ER 419 (Dozois: investors "were never told that the money from a single property was going to stay there"), 420, 430-431. In many cases, CCF brokers encouraged investors to "diversify" their risk exposure by investing in several different Sunwest projects and implied that the investors should evaluate the differences between them. SER 547, 1207, 1261-1262 (some investors visited the facility in which they were investing).

The private placement memoranda that CCF and Sunwest's lawyers prepared reinforced this promise by stating that investors' rent would not be paid unless the particular facility had positive cash flow. *E.g.*, SER 2322; *see also* SER 393, 807, 1470. Harder personally reinforced the notion that Sunwest's facilities were financially

---

[5] SER 1670 (Allen Painter, U.S. Trustee's office)

8

independent. In a conference call with investors, Harder told them "emphatically" that "he did not rely on new deals to underwrite the day-to-day operations of Sunwest or [Canyon Creek Development]" and that his "bottom line" was that project funds were not diverted from one project to another. SER 385, 893. Sunwest's own lawyers thought that its offering documents failed to disclose to investors Sunwest's routine practice of inter-facility lending. SER 797.

Similarly, the operating agreements contained a "standard" prohibition on commingling assets as well as the loan covenants that promised the creation of SPEs that would not take on additional debt. SER 126. Although TIC investors had no ownership interest in the OpCo, CCF provided these agreements to some investors as context for their investment. *E.g.*, SER 860. Because it isolated investors' risk exposure, a facility's financial independence (its SPE status, *see supra* p.6), was an entrenched industry norm. SER 1076. In fact, this was such an entrenched practice that if Sunwest had wished to operate differently, it needed to disclose that in "bolded language in caps [on a] page set apart from everything else." *Id.*

As its second promise to investors, CCF assured them their investments were sound. CCF touted the fact that Sunwest had "never missed a rent payment" in over 15 years. ER 61; SER 389, 883, 1216, 1700. CCF connected potential investors with past investors who vouched for this fact. SER 551, 1701. As part of its pitch, CCF brokers called Sunwest properties "safe" investments. SER 1205, 545-546 (CCF led a "conservative" investor to believe Sunwest was a "guaranteed success investment").

9

Harder told one 75-year-old retiree that "he would put his own mother in" a Sunwest investment that closed in May 2008, mere weeks before the company halted all rent payments. SER 1268.

Third, CCF promised that the facilities would have cash reserves to cover 18 months to three years of operating expenses. ER 61; SER 559-560, 1014-1015. These reserves were to cover renovations and improvements to the facilities as well as marketing campaigns to increase occupancy. SER 596-597. CCF also said that the reserves would be sufficient to make all the rent and debt-service payments during the turnaround phase. SER 378, 1014. Because of § 1031's restrictions, the TIC investors did not own the reserves, but to distinguish between their equity and the reserves would be "silly," according to long-time real-estate lawyer and Sunwest investor Lindell Van Dyke, because "the project is what is important" for generating the revenue that would pay investors' rent. SER 1010. That is, although they were purchasing a fee interest in land, they were doing so because of Sunwest's overall business model that included promises about how the reserves would be used. SER 1009-1011. This was a standard way of doing business, so standard in fact that Van Dyke said if anyone in his firm had tried to structure a deal that would permit lending one project's reserves to another project, "they would have been escorted out of the building" for malpractice. SER 1016.

Fourth, in many cases, Harder personally promised investors that he would back their investment "[i]f they had a hiccup." SER 1006; *see also* SER 381, 884, 1269. To bolster this promise, Harder claimed to be worth between $300 and $970 million and

10

provided some investors with a personal financial statement. SER 377-378, 1266, 1695, 2309.

Fifth, CCF held Sunwest out as a "successful company," pointing to its track record in turning around facilities and its exponential growth. SER 377, 1276-1277. Harder participated in calls comforting investors and assuring them that Sunwest had the "capacity to stand behind its obligations." SER 886. When investors asked if there were any problems at Sunwest, Harder and others told them, no. SER 1277.

Sixth, CCF promised that the TIC investments qualified under § 1031. ER 62. And in addition to the annual rent payments, investors were promised a minimum two percent annual increase in the value of their deed with an eye towards the day, a few years out, when Sunwest would refinance the then-turned-around facility and buy out the investors. *E.g.*, SER 1012.

Each of these representations was material to Sunwest's investors, in both PMI and TIC deals. *E.g.*, SER 499, 501, 520, 561, 1221-1222, 1278-1280.[6] In particular, the properties' independent nature "was important to" all investors because they sought to "limit any exposure to one company." SER 497; *see also* SER 874 (SPE status "put a bubble around" each investment). And because of this sales pitch, from 2005 through

---

[6] Harder also traded on his membership in a Seventh Day Adventist congregation to lure in investors and told people that Sunwest was "a mission that God had given him to provide senior housing." SER 913-914, 1268.

11

mid-2008, hundreds of people invested nearly half a billion dollars in 107 Sunwest deals. SER 47, 1511.

C.  "There is no word to even explain how inconsistent this is."[7]

Despite its rosy promises, Sunwest's sales pitch was misleading. As Harder has never disputed, inter-facility lending at Sunwest was "rampant." SER 2496; SER 1908-1916 (Harder); *see also* SER 507 (Harder told PMI investor his money was diverted because "[w]e needed the money someplace else"). The practice interlocked Sunwest's many corporate entities like a "plate of spaghetti." SER 603. Although Sunwest recorded many of the loans on its internal balance sheets, Sunwest and CCF employees, at Harder's direction, did not provide those financial records to investors even when asked. SER 629, 772-773, 899.

The inter-facility lending was in fact so "pervasive," SER 273, that multiple business experts and a federal judge declared Sunwest was operating a "unitary" enterprise despite the hundreds of corporate entities. ER 38 & n.39 (citing Judge Hogan's opinion in the SEC case); SER 43 (restructuring officer: "commingling took place independent of these corporate structures"), 99-100, 272-273 (turnaround expert), 1067 (real-estate lawyer: irrelevant "how many Hydra heads they have on the Sunwest beast"), 1429 (bankruptcy trustee).

---

[7] SER 901 (Tamera Sanner, CPA and registered § 1031 accommodator).

As Chief Restructuring Officer Clyde Hamstreet described it, funds were "typically taken from wherever they could be found within the company and used wherever they were needed." SER 32. Over time, as the company's liquidity crisis worsened, this became what Chief Financial Officer Curtis Brody called the "daily hunt for cash." SER 595. This hunt invaded the reserves, with Brody reporting that anything available was "picked clean." SER 1286; *see also* SER 598. Thus, although it was accurate that Sunwest had never missed a rent payment, this was attributable to inter-facility lending and not the purported unbroken chain of successful turnarounds. ER 61.

Harder was also not worth as much as he claimed. The financial statement he provided did not include hundreds of millions of dollars in liabilities mortgaged against the listed assets. SER 148-149, 296. Moreover, the asset valuations were Harder's own estimates, not market-based appraisals that would have shown many of the properties to be worth less than their mortgages. *See* SER 296.

And, as a company, Sunwest was "floundering." SER 296. Sunwest's "cash burn rate"—the amount by which its expenditures exceeded its receipts each month—was large and growing, meaning the company was spending more than it earned. In 2005, Sunwest's senior-housing portfolio lost $8.2 million, a figure that rose to $64 million in 2007 and more than $20 million in the first quarter of 2008. SER 286-288, 1498, 2481

(Ex. 134, at right). By May 2008, the cash burn rate was $10 million a month. SER 2237. Sunwest was not disclosing its liquidity problems or loan defaults. SER 275.



These figures do not include Sunwest's $400 to $500 million non-senior-housing portfolio, of which Harder was "the sole or majority owner." ER 36. Sunwest used money generated by the investor-owned senior-housing projects to maintain these Harder-owned non-senior housing projects. SER 290. This constituted a "significant cash drain on the operations of Sunwest," to the tune of $3.4 million every month. SER 1385, 1565, 774. And when an outside expert told Harder he should abandon this portfolio because it was draining the enterprise's cash and was inconsistent with Sunwest's mission, Harder refused to listen. SER 1385.

These cash-flow difficulties caused problems with Sunwest's vendors, who supplied the facilities with everything from food to maintenance to electricity. SER 32. When Sunwest took over a facility, a common strategy for freeing up cash, often for

14

use at another facility, was to delay vendor payments by up to three months. SER 2001-2002; *see also* SER 31 (because Sunwest had previously delayed payment to vendors, the restructuring firm was unable to use this tactic when it took over), 281 (same). This led to several occasions when vendors threatened to stop providing services. SER 30-31. The residents in Sunwest's facilities, who depended on these services, were, on average, 85 years old. SER 38.

Finally, because Sunwest's commingling of assets caused even successful properties to fail, investors lost the benefit of their § 1031 exchanges and owed back taxes. *E.g.*, SER 565-566, 1708.

D. Disclosure was "the lesson that one would have thought Harder had learned."[8]

Three years before Harder's fraud began, one of his partners, Jeffrey Kraus, who had an interest in 14 Sunwest properties, sued Harder, SMI, and other Sunwest principals, alleging fraud and racketeering. *Kraus v. Harder*, No. 03-1198-MO, 2004 WL 716576, *1 (D. Or. Mar. 31, 2004). Kraus's suit challenged Harder's practice of "loaning" money from one facility to another, even though the facilities were separately incorporated and owned by different sets of investors, without informing the owners or getting their permission—essentially "robbing Peter to pay Paul." *Id.* at *2. Although the district court denied the requested preliminary injunction, it found that the suit raised "serious questions about defendants' performance of their fiduciary duties." *Id.*

---

[8] ER 57 (district court).

at *6. The court was "most troubled by defendants' transferring homes' money without so much as informing the owners." *Id*. And the court concluded that "the evidence showed that Sunwest's officers deliberately sought to conceal the transfers whenever it believed an investor such as Kraus might object." *Id*.

Following the court's opinion, CFO Brody approached Harder about inter-facility lending. SER 590. Brody, upset by the "heartburn" caused by constantly moving money around, wanted to quit, but Harder convinced to him to stay by promising to cut back on inter-facility lending. SER 590-591. Brody, along with Sunwest's in-house counsel, tried to get Harder to follow outside counsel's "advice … to make sure that [their] organizational documents and management agreements allowed for the relationship [with] the affiliates and the intercompany borrowing." SER 592. Harder, however, refused, saying that the "lenders weren't going to go for that," meaning that the banks would not make loans if they knew about the inter-facility lending. SER 593. Overall, "[i]t really didn't change much," except that Harder placed a "handful" of properties on a "do not touch" list, walled off from inter-facility lending, after a lender or partner complained. SER 591, 594-595.

Fast forward to January 2008. Sunwest worked with attorney Gibson Masters at K&L Gates, in addition to its regular outside counsel (Dozois), on a deal for West Salem Senior Living. SER 629. When Masters discovered Sunwest's inter-facility lending practice, he threatened to quit unless CCF issued a supplemental private placement memorandum to West Salem investors disclosing the practice. SER 629, 795, 2475.

16

CCF did so, but that disclosure promised that the "practice ha[d] ceased," which was not true. SER 628-629, 2454. That disclosure did not carry forward into future offerings. SER 392, 2414.

Consistent with the *Kraus* opinion and Masters's advice, real estate professionals agreed that, although SPE status was the industry norm, it would not have been problematic for Harder to conduct inter-facility lending had it been disclosed to investors in advance. SER 877, 1018-1021.

E. Harder lived a "big lifestyle."[9]

While his business was floundering, Harder was living large. Each month, Sunwest paid $401,000 on loans in Harder's name, some but not all of which supported Sunwest projects. SER 631. Sunwest also paid between $64,000 and $100,000 every month for Harder's personal mortgages on six houses and six additional plots of land. SER 631, 634, 1571, 2482. By the summer of 2008, at the same time payments to investors had halted, Sunwest paid $601,000 a month on Harder's behalf for various expenses. SER 352. Harder's wife, who did not work for Sunwest, also regularly called Sunwest's financial staff to request money, sometimes $100,000 at a time. SER 632-633. Even after Sunwest was in receivership, Harder received $54,000 each month as a settlement for his cooperation with the consolidated bankruptcy plan, an unheard of amount. SER 1518.

---

[9] SER 1924 (Harder).

In addition to these cash payments, Harder used KDA Construction, a Sunwest affiliate, to build his 20,000 square foot mansion in Salem. SER 38-139, 634, 2483-2486 (photos of the home). Sunwest paid $125,000 a month for two airplanes, including a jet that could fly coast-to-coast. SER 636-637. Harder often flew on the smaller plane to his vacation house in Sunriver, Oregon for the weekend. SER 1568. Sunwest also bought Harder two identical Range Rovers, one for Salem and one for Sunriver, to obscure the fact that he had flown there instead of driven. SER 1571-1572. Harder employed four tutors and a nanny for his daughter at a cost of $6,000 a month and routinely traveled the world, first-class, with his family (and one of the tutors), all on Sunwest's dime. SER 1574-1575, 2016.

All told, from January 2006 to June 2008, Sunwest paid more than $83 million to Harder or on his behalf. SER 1568-1569.

F.  "The worst crisis I had ever seen."[10]

In the midst of Sunwest's expansion, the larger economy stumbled, exposing the undisclosed instability in Sunwest's business model. That model relied on the company's ability to refinance its properties as well as having a market of older people who could sell their homes to move into Sunwest's facilities. SER 89, 248, 401, 1299. In 2007 and 2008, refinancing became scarce. *E.g.*, SER 330-331, 1376. Occupancy rates at many Sunwest facilities also stopped rising. SER 701-702.

---

[10] SER 30 (Hamstreet).

Simultaneously, the pace of acquisition of new facilities, roughly one per week, was too fast to conduct adequate due diligence. SER 278. And although Sunwest had initially been successful in turning around underperforming facilities, many of the later-acquired properties "weren't actually turned around" and suffered from deferred maintenance, needing around $30 million in repairs. SER 276-277, 1319. But Sunwest was trapped in a "vicious cycle" of acquisition. SER 280. The company needed cash and acquisitions led, temporarily, to more cash—through an influx of lending reserves and a new revenue stream with new vendors who could be put off for a few months. SER 280-281. As acquisitions increased, however, so did Sunwest's liquidity problems. SER 605.

These financial difficulties also led most facilities to breach their loan covenants. For example, GE Capital owned almost $600 million in Sunwest loans, and most (if not all) of those loans required the facilities to maintain a debt-service coverage ratio of greater than one, meaning that the facility had more cash on hand than required to pay its bills. SER 133, 153, 465-466. But a number of facilities had ratios under 0.5. SER 466. In June 2007, GE audited its Sunwest loans and found that nearly every one was in some form of default. SER 133. In September, Sunwest paid GE $3 million in forbearance, to forestall foreclosure. SER 135-136, 237, 624.

In December 2007, Sunwest's hunt for cash hit a wall. At that time, Sunwest closed two PMI deals for properties in Clovis and Hobbs, New Mexico. ER 84. Knowing it was inconsistent with what investors had been told, Harder directed that

19

investor funds be "used to meet payroll and other Sunwest-related financial obligations." ER 19. Similarly, in May 2008, Sunwest closed the West Salem/Cottonwood PMI deal, and Harder diverted $1 million of investor funds to cover Senent's payroll taxes. SER 1275; ER 19-20 n.2.

Even this was not enough to save Sunwest, and in January 2008, GE again noticed defaults, this time seeking at least $14.5 million in forbearance, which Sunwest could not pay. SER 1367. This resulted in the first of many Sunwest properties declaring bankruptcy. SER 253-255.

In April 2008, GE required Sunwest to hire a turnaround firm, Alvarez & Marsal, which made Harder unhappy. SER 268-271; *see also* SER 912 (Harder later told investors he made the "proactive" decision to hire the firm). Matt Marcos, the head consultant, had worked on over 100 distressed assets in the healthcare sector, mostly nursing homes, and noted that when he arrived, Sunwest was in "panic mode" amidst the "worst [liquidity crisis he] ha[d] ever seen." SER 272, 276. In preparing his turnaround plan, Marcos met with Dozois. SER 273. When Marcos brought up Sunwest's "pervasive commingling," Dozois "seemed [to] panic" and "went pale." *Id.* Marcos believed either that Dozois "wasn't aware of it or wasn't aware that others were aware of it." *Id.*

On May 30, 2008, Rick Arrowsmith of GE Capital held a meeting in New York with Harder, Brody, representatives of Alvarez & Marsal, and others to discuss Sunwest's financial condition. SER 141, 260. Arrowsmith was "apoplectic" at Sunwest

20

for disregarding the facilities' single-purpose restrictions and "told all those guys they ought to get criminal defense lawyers." SER 141-142. When Harder claimed that he hoped to solve the cash crunch by refinancing some of the properties, Arrowsmith warned him that "[h]ope is not a plan." SER 260-261, 1377.

Despite this turmoil, Sunwest continued to solicit new investors and never disclosed the defaults or the turnaround firm. SER 50, 509, 523, 902-903. Indeed, shortly after the GE meeting in New York, Harder solicited hundreds of thousands of dollars in investments for a new deal without disclosing any of Sunwest's difficulties. SER 509-512, 2114.

On July 8, 2008, Sunwest sent a letter to investors suspending all rent payments indefinitely. SER 351, 2472.

G. For Harder, multiple offers to buy Sunwest "w[ere] not high enough."[11]

In the midst of Sunwest's collapse, from mid-2007 to early 2008, Harder had four chances to stabilize Sunwest by selling assets; each time he declined and never provided investors the opportunity to sell. In mid-2007 Holiday Retirement, the company Harder sought to emulate, sold for around $6.6 billion, or $189,000 per unit, a record-setting amount. SER 1301, 1357. Holiday was a successful and stable company, and its facilities were 95 to 97 percent occupied. SER 1306. In contrast, Sunwest's

---

[11] SER 1352 (Mike Deines, head of Canyon Creek Development, on an offer to sell at $145,000 per unit).

facilities were only 74 or 75 percent occupied on average. SER 1309-1310. Harder nonetheless believed that Sunwest should fetch $175,000 per unit. SER 1357; ER 58 (Holiday sale "appears to have affected Harder's perception of the value of Sunwest's senior housing portfolio.").

In the first of four opportunities to sell all or part of Sunwest's asset portfolio, in the spring of 2007, Harder approached the company that orchestrated Holiday's sale. SER 1348. That company offered to market Sunwest's portfolio at around $125,000 per unit, but Harder declined. *Id.* Next, in May 2007, AEW private equity evaluated Sunwest and discussed a purchase at around $145,000 per unit. SER 1351-1352. Again, Harder thought this too stingy. SER 1352. Third, in early 2008, CBRE real estate marketed a portfolio of 242 Sunwest properties (called the Diamondview package) at a price of $140,000 to $150,000 per unit, but got no interest. SER 1303-1305. Finally, later in 2008, Sunwest and CBRE culled a subset of 152 higher-occupancy properties ("Treadstone" package) and again sought $140,000 to $150,000. SER 1311-1313. The best offer they got was $107,000. SER 1313. Sunwest ultimately followed up on that offer and sold its GE-backed properties to the Lone Star group for $103,000 per unit in January 2009. SER 1315, 1518.

If Harder had accepted either of the 2007 opportunities, all Sunwest investors and principals would have walked away whole. SER 1356-1357.

H. "[E]verything I've worked for is gone."[12]

By mid-2008, lenders pushed Sunwest's facilities into bankruptcy like dominoes. ER 55. In January 2009, Harder filed for personal bankruptcy, and in March, the SEC sued Harder and Sunwest for securities fraud. *Id.*; SER 1423-1424. The SEC court took charge of the bankruptcies and bundled all the assets into a receivership, which dismantled Sunwest, attempting to recover as much as possible for investors. SER 1424; ER 55. Along the way, the receiver sued Sunwest's outside counsel, including Dozois, for their roles in Sunwest's failures to disclose, recovering over $50 million in settlements from three large firms. SER 841. Despite the receiver's efforts, however, investors received only a fraction of their investments back. SER 1579.

The investors, many of whom were retired, had to go back to work or significantly alter their retirements. SER 1709, 1107, 1255-1256. They also suffered mentally and emotionally. *E.g.*, SER 919 (PTSD diagnosis), 530 (divorce).

## II. Procedural History

A. Harder pleaded guilty to defrauding the PMI investors.

Harder pleaded guilty to defrauding the Clovis and Hobbs PMI investors. In connection with his plea, he admitted that the offering memoranda "represented to investors that their funds would be used to complete construction of the respective facilities." ER 84. Harder, however, "decided to use investor funds … to meet certain

---

[12] SER 1707 (Dr. Lloyd Hiebert, victim).

Sunwest business expenses and as well certain of his own personal financial obligations." *Id.* Harder admitted that he "knew that this use of investor funds was not contemplated by the … investors" and that they were not informed that their money would be used this way. *Id.* He agreed that this knowledge constituted an intent to defraud those investors. ER 83-84.

Harder's plea agreement provided for a somewhat unusual sentencing proceeding. Although Harder admitted defrauding the Clovis and Hobbs PMI investors, he maintained that TIC investors' money was used solely as promised: as equity to purchase property. ER 83-84; *e.g.*, SER 839, 924-928, 1037, 1045-1053. Because Harder refused to admit that these TIC transactions were also fraudulent, the parties agreed to a two-part sentencing hearing. ER 82, 87. In Phase I, the court was to determine "whether defendant's scheme to defraud exceeded the counts of conviction, as alleged in the Indictment, and all relevant conduct related to it." ER 82. In Phase II, the court would conduct a traditional sentencing hearing, determining the applicable Sentencing Guidelines and imposing sentence in accordance with 18 U.S.C. § 3553(a). *Id.*, ER 87. In addition, the government agreed not to seek a sentence greater than 15 years, and Harder agreed not to seek one less than five years. ER 90.

From May 12 to May 28, 2015, the court held the Phase I hearing. The government presented testimony from Sunwest insiders including Curtis Brody (Chief Financial Officer), John Thurber (head of CCF), and Tom Wettlaufer (in-house counsel), as well as from Matt Marcos (a turnaround consultant), Clyde Hamstreet

24

(Chief Restructuring Officer), Rick Arrowsmith (of GE Capital), and Allen Painter (who oversaw Harder's bankruptcy for the U.S. Trustee). In addition, six victims testified, and FBI Agent Jeremy Gorman presented summaries of his interviews with over a hundred others. Harder testified in his own defense, called outside counsel Tim Dozois and several others, and submitted two expert reports.

B. The district court found Harder's "pervasive fraud" encompassed all investors.[13]

Overall, the district court found that Sunwest operated as outlined above. ER 30-55.[14] In particular, the court credited the victims and Thurber in their descriptions of Sunwest's sales pitch. ER 46-48, 62. This included the representations that Sunwest was successful, that each facility stood alone, that reserves would cover expenses during the turnaround phase, and that Sunwest had never missed a payment. ER 46. The court found no material differences between the sales pitch for TIC and PMI investments. ER 47.

Also crediting Thurber and the victims, the court concluded that Sunwest's practice of commingling funds through inter-facility lending was "inconsistent with these representations." ER 47. Rejecting Harder's testimony, the court concluded that only "some" and not "many" investors were told about the inter-facility lending. ER

---

[13] ER 62 (district court).

[14] The court initially issued its findings of fact and conclusions of law on July 20, 2015. *See* ER 468. Harder filed objections, ER 67-81, and the court issued an amended opinion on November 4, 2015, ER 14-66. The changes were minor.

57. Instead, the court relied on CFO Brody's account of his conversation with Dozois in which Dozois appeared shocked to learn that others knew of the practice and Thurber's statement that had he known, "he would not have marketed Sunwest's TIC investments at all." ER 57. Quoting Judge Mosman in *Kraus*, the court found Harder's testimony "evasive and not readily believable." *Id.*

The district court did not accept Harder's argument that the TIC investors were not defrauded because he promised them only a deed and that is what they got. *See generally* ER 43-48; SER 2101-2107, 2171 (closing argument). Rather, the district court believed the TIC victims, who almost unanimously reported that they would not have invested had they known the truth. ER 48. Accordingly, the court determined that the misrepresentations were "[m]aterial." ER 43.

| Summary of the ways in which Harder misled investors (ER 61-62) | |
|---|---|
| **Representation** | **Misleading because:** |
| SPEs provided independent investments. | Nondisclosure of "pervasive commingling of funds" |
| Sunwest had never missed a payment. | Nondisclosure that inter-facility lending was often the reason why |
| Facilities would maintain reserves to cover three years of rent and operating expenses. | Nondisclosure of the "significant risk" that reserves would be unavailable due to inter-facility lending |
| Sunwest was a successful business. | Nondisclosure of overall negative cash flows and the "substantial cash drain" cause by the non-senior housing portfolio |
| TIC investments qualified under § 1031. | Nondisclosure that Sunwest's unitary enterprise and commingling created a "substantial risk" that the IRS would disallow tax-deferred treatment |

As to Sunwest's collapse, the court accepted the defense expert's view that the "economic crisis" bore some blame for the timing. ER 59-60. But, the court concluded, "[i]n the context of this criminal prosecution, … [that was] beside the point" because Harder "knowingly and intentionally misled investors." ER 60.

The court also credited CFO Brody's account of Harder's heavy involvement with the company's disclosures. ER 33. It found that Harder was sometimes present during CCF sale pitches to TIC investors and therefore knew what representations were being made. ER 46. Based in part on those accounts as well as on the *Kraus* litigation and the Masters interaction, which was documented in emails, the court found that Harder knew that he and Sunwest were misleading TIC investors as well as PMI investors. ER 32-42. Accordingly, the court concluded that Harder's scheme to defraud encompassed all Sunwest deals from 2006 to 2008. ER 62-63.

C. The court sentenced Harder to the plea agreement's maximum.

On November 16 and 17, 2015, the court conducted the Phase II hearing. After hearing from additional victims, the court calculated the applicable guidelines offense level as 43 and placed Harder in criminal history category I, for a guidelines range of life, capped by the 30-year statutory maximum. SER 2224-2227. In accordance with the plea agreement, the government sought a 15-year sentence, which the court imposed. SER 2220-2223, 2227-2236. Harder is incarcerated serving this sentence.

## III. The Court Received and Read Letters from the Public During Phase I.

Following Harder's guilty plea, the court began to receive letters from the public, mostly from investor-victims. SER 2 (court received 35 letters); SER 1714 (court received many additional letters and emails and would inventory and send them to the parties); SER 1872 (count up to 110). The court provided the parties copies of the letters and informed them that it would read the letters. SER 2, 5. Harder objected to the court reading the letters in Phase I, arguing that as victim impact statements, they should be relegated to Phase II. SER 5, 10. The court acknowledged "the distinction between what [it] need[ed] to do in Phase I … [and] what [it] need[ed] to do in Phase 2," SER 4-5, but determined that "some of the letters [were] relevant to the issues that [were] before [the court] in Phase I." SER 19-20. The court told Harder that he would "have every opportunity to point things out, to point out erroneous statements" in the letters. SER 11.

On the second day of Harder's testimony, the court informed the parties that although it "ha[d] not been thinking about what [it] ha[d] been reading in those letters as part of the issues in this [Phase I] proceeding," one of the law clerks had "brought three [letters] to [the court's] attention" that did "relate to some of the issues that Mr. Harder is talking about." SER 1867. The court noted that the letters provided "some practical real context" for its questions and identified the three specific letters. SER 1867-1868. The court reiterated that determining "the scope of the alleged fraud" was "all that [it was] going to be doing in Phase 1 of this proceeding" and found that the

28

letters were not ex parte communications because the court shared them all with the parties. SER 1871. The court stated (twice) that it was only "skimming" the letters to see if they had any Phase I-relevant information. SER 1872. And the court reassured the parties that it was "perfectly capable of basing the decision [i]n Phase 1 of this sentencing proceeding solely on the relevant and legally appropriate information" and would "not consider anything that has not come out in this courtroom other than essentially … legal research." SER 1872, 1873.

At the end of Harder's testimony, the court questioned him about two factual claims made in the three previously identified letters: whether he personally told investors that each entity stood alone and whether CCF sold investments to non-accredited investors. SER 1955-1959.

## IV. Rulings Under Review

Harder challenges the district court's factual findings on the scope of the fraud, ER 14-66, and it decision to review, during Phase I, the letters it received, ER 445-447; SER 5, 1867-1873.

SUMMARY OF ARGUMENT

1.      A mail fraud scheme's scope turns on the defendant's intent. The evidence here established that Harder intended to defraud all his investors equally, regardless of the form of their investment. He told the same lies to all investors: the facility would stand alone; Sunwest had never missed a payment; each facility had reserves to cover its turnaround period; he would guarantee their investments; and Sunwest was

29

successful. He did not disclose the inter-facility lending, his true financial situation, or Sunwest's cash-flow and loan-default problems. Unsurprisingly, all the investors found each of these misstatements material—the TIC investors did not believe they were buying only a deed; they believed they were investing in specific property that would be used in a specific way. These facts practically compel the district court's conclusion that Harder's fraud was broader than just the Clovis and Hobbs PMI investments, and that conclusion is, therefore, far from clearly erroneous.

Harder's defense misses the point. First, the evidence demonstrated that Harder did, in fact, have an advance plan to defraud investors because he knew his sales pitch was false when he made it, but in any event, an advance plan is not required. Second, Harder did not just fail to disclose trivial facts, his failures to disclose rendered aspects of his sales pitch patently misleading. But even if it had not been misleading, as a registered broker-dealer, he also owed his investors a duty of full disclosure, which he repeatedly breached. Third, Harder did in fact actively conceal facts when he told investors everything was fine at Sunwest despite multiple default notices and negative cash flow in the tens of millions.

Although Harder claims that the district court violated the Due Process Clause by failing to address testimony from Sunwest's outside counsel (Dozois), a district judge is not required to make specific credibility findings for every witness. Dozois's testimony largely mirrored Harder's, which the district court did specifically find largely incredible for reasons detailed in its published opinion. Moreover, the district court had

30

sound reasons to reject Harder's efforts to blame Sunwest's demise on his lawyers given his involvement in virtually every aspect of the fraudulent scheme and the fact that he profited richly from his efforts. Due process requires nothing more.

2. The court did not abuse its discretion in skimming the victim letters it received during Phase I. During sentencing, the Federal Rules of Evidence do not apply and virtually no limit applies to the information a court may consider. Many of the letters addressed factual issues relevant to Phase I, including what Harder told the investors. The court was entitled to review that information and raise questions about it with the parties and witnesses. No authority supports Harder's claim that a sentencing judge must insulate himself from certain information at particular times or risk unalterably tainting his ability to be fair or impartial.

Nor did the court's process present any problem. The court provided the letters to both parties, kept the parties apprised of its questions, and identified specific issues before asking questions. Harder possessed no right to watch the court as it read the letters. Finally, the government acted properly and in accord with the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, when it encouraged the victims to attend the proceedings and send letters to the court. Those rights apply before the court has a chance to determine who is a victim, and the government has an independent obligation to enforce them.

## ARGUMENT

### I. The District Court's Finding Regarding the Scope of Harder's Scheme Is Not Clearly Erroneous.

Harder assails the district court's factual finding regarding the fraud's scope, arguing primarily that the court inappropriately ignored Dozois's testimony. Br. 48-63. The record, however, overwhelmingly supports the court's factual findings, and the court considered, although it rejected, Dozois's views.

#### A. Standard of review

In the plea agreement, the parties agreed that "the [c]ourt's determination of the scope of the defendant's scheme to defraud is a factual one and that the standard of review on appeal is clearly erroneous." ER 90-91; *see United States v. Tulaner*, 512 F.3d 576, 578 (9th Cir. 2008). A factual finding is only clearly erroneous if "the judge was wrong with the force of a 5 week old, unrefrigerated, dead fish." *United States v. Rivera*, 825 F.3d 59, 67 (1st Cir. 2016) (internal quotation marks omitted); *see also Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

#### B. The facts support the court's opinion.

Mail fraud requires the defendant to create a "scheme or artifice to defraud," which includes the defendant's intent to defraud his victims. *United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 2010). The factfinder may infer intent from circumstantial evidence, including the defendant's misrepresentations and "the scheme itself." *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (internal quotation marks omitted).

32

Case: 15-30359, 12/01/2016, ID: 10216661, DktEntry: 29, Page 39 of 58

Although the intent to defraud must be "specific intent," that phrase serves only to distinguish knowingly false misrepresentations from those that "result [from] ignorance, mistake, or accident." *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir. 1984) (approving jury instruction requiring "specific intention to defraud, that is, to deceive or mislead [the victim in its purchasing decision], rather than as a result of ignorance, mistake, or accident"); *Treadwell*, 593 F.3d at 997 ("an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud" (internal quotation marks omitted)); *see also United States v. Wynn*, 684 F.3d 473, 479 (4th Cir. 2012) (defendant's knowledge of fact's falsity and materiality suffices to prove "specific intent" to defraud). "[A]n honest belief that the company would eventually succeed" is no defense to defrauding investors with false statements about the company's current operations. *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979).

Nor is intent synonymous with motive—the reason why a defendant lied to get the victim's property is irrelevant. *Treadwell*, 593 F.3d at 996 ("[O]ne can intend to 'deprive' a victim of property within the meaning of the statute without intending to cause pecuniary loss."). What matters is that the lie "was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Irwin v. United States*, 338 F.2d 770, 773 (9th Cir. 1964). Even when the defendant harbors "a good-faith belief that the victim will be repaid and will sustain no loss," that "is no defense at all" because the harm is "depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent

33

loss of money or property." *Treadwell*, 593 F.3d at 997 (internal quotation marks omitted); *United States v. Oren*, 893 F.2d 1057, 1062 (9th Cir. 1990) (defendant's belief in property's value no defense to fraud for lying to appraiser); *Green*, 745 F.2d at 1209 (victim had a "right to make an informed [purchasing] choice"). And the defendant's intent follows the lie such that even when he lies to a third party, like an appraiser, a retailer, or a bank, knowing that the ultimate victim will rely on that third party's actions, he has defrauded both the intermediary and the victim. *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (car dealer who rolled back odometers on used cars and distributed them through unknowing retailers guilty of defrauding consumers); *Oren*, 893 F.2d at 1062 (defendant who lied to appraiser on which purchaser relied guilty of defrauding purchaser).

Here, the evidence supported the district court's intent findings. First, multiple witnesses testified to the various representations Sunwest representatives, and Harder personally, made. For example, two investors recounted a November 2007 conference call in which Harder told investors that Sunwest did not use money invested for one project on any other project. SER 385, 893. And 96 percent of investors whom Agent Gorman interviewed indicated that they did not know about the inter-facility lending and would not have invested had they known. SER 1279. No one was told about Sunwest's financial difficulties, and those who asked were reassured. SER 1276.

Second, multiple witnesses explained how those representations were untrue and material—and how Harder must have known. For starters, Harder has never denied

that inter-facility lending took place. SER 1908-1916. And the district court rejected his claim that he disclosed the practice to "many investors." ER 57; *see also id.* (Judge Mosman, presiding in *Kraus*, found Harder's testimony "evasive and not readily believable."). He had also been warned by a federal judge and by his own lawyers that continuing the practice without explicitly disclosing it to investors was misleading. *Kraus*, 2004 WL 716576, at *6; SER 629, 795. When Brody confronted him about disclosing the practice, Harder resisted, knowing that "the lenders weren't going to go for that." SER 593. Given that SPE status was an entrenched industry standard, SER 1076, there is no reason to think investors would have been any more favorable to the contrary practice of inter-facility lending than the banks. *See* SER 1279 (96% of investors would not have invested had they known); ER 392 (Dozois agreeing investors would want the same protection SPE status provides); *cf.* SER 1016 (real-estate lawyer: anyone proposing such a structure "would have been escorted out of the [law firm's] building" for malpractice). And even after Masters got Harder to disclose the practice in a supplemental memorandum to some investors, Sunwest lied again by promising the "practice ha[d] ceased" but continuing undeterred. SER 628-629.

This is sufficient to demonstrate that Harder deprived his investors "of the opportunity to weigh the true benefits and risks of the transaction," *Treadwell*, 593 F.3d at 997, and that he did so intentionally and not "as a result of ignorance, mistake, or accident," *Green*, 745 F.2d at 1209.

Harder's protestations to the contrary are unavailing. Although he buries the details in a footnote, at bottom, Harder's argument is (as it was below) that he never intended to defraud the TIC investors because they got what they bargained for: the only thing § 1031 permitted them to get, a deed. Br. 48-49 & n.42. This is an attack on the materiality of the misrepresentations—that Harder's misleading non-disclosures were irrelevant to the TIC investors because they had no interest in how Sunwest or its affiliates, including the OpCos, operated because they were mere landlords. The record overwhelmingly refutes this argument. When the TIC investors bought land with Sunwest, they did so because Sunwest promised to operate the specific facility in a specific way. *E.g.*, SER 499, 501, 520, 561, 1221-1222, 1278-1280. Sunwest bolstered this reliance when it gave TIC investors OpCo operating agreements. SER 860. In short, none of the investors were buying a mere warranty deed without regard to how their tenant would operate; they were investing in Sunwest's purported business model. SER 1670; ER 48.

Harder also makes three more specific attacks on the court's intent finding, none of which holds water. First, he contends that he never had a "plan" to mislead his investors. Br. 54. This is both untrue and irrelevant. As the facts outlined above demonstrate, Harder lied to investors at the time he sought their money, promising them a low-risk, independent investment when he knew the company was operating at a deficit and commingling assets left and right. Moreover, wire fraud does not require an advance plan; it is equally fraudulent for one to solicit investors' funds first and then

36

misappropriate them. *United States v. Jones*, 472 F.3d 1136, 1140 (9th Cir. 2007). Thus, even if Harder had not intended to commingle the funds before soliciting them, he defrauded his investors when he in fact used their money (and the loan proceeds their equity enabled) for unauthorized purposes, knowing that he had promised to keep each facility's funds separate.

Second, Harder argues that the evidence shows only his nondisclosure of facts and that is not enough. Br. 55-56. Again, this argument distorts both the record and the law. When Harder and Sunwest affirmatively represented each facility as a stand-alone investment, by for example encouraging people to "diversify" by investing in multiple properties—and particularly when they issued a revised offering document stating that inter-facility lending had ceased—they affirmatively misrepresented the truth. *See Beecroft*, 608 F.2d at 755–756 (misleading marketing materials are mail fraud because they are, by definition, designed to sell). Furthermore, Harder was a registered securities dealer and as such owed his investors a duty to disclose all material facts. SER 365-366, 871. Although a duty to disclose information is not a prerequisite to mail fraud, the violation of such a duty is certainly sufficient. *United States v. Dowling*, 739 F.2d 1445 (9th Cir.1984), *rev'd on other grounds*, 473 U.S. 207 (1985).[15]

---

[15] The case on which Harder relies, Br. 51, to argue that absent a duty to disclose, omissions are not sufficient, *United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000), is unavailing. First, the court's discussion of the duty to disclose relates to materiality, not intent. *Id.* at 119-120. Second, the court found sufficient evidence of scienter where the defendant marketed an offering document after having been told it was inaccurate, "vouched for [the company's] financial situation despite his knowledge that [a lender]

Third, Harder submits, relying on *United States v. Colton*, 231 F.3d 890, 899-900 (4th Cir. 2000), that "active concealment" is required. Br. 56. *Colton* does not help Harder. There, the defendants defaulted on a loan to a bank and to relieve themselves of having to repay it, sought to convince the bank to sell the loan, at a discount. 231 F.3d at 901. Knowing that the bank would not sell at a discount to the defendants (essentially forgiving half the loan's value), they established a shell company to make the purchase and declined to answer the bank's questions about who owned the company. *Id.* The court found this nondisclosure more than sufficient to establish concealment and fraudulent intent. *Id.* Similarly here, Harder knew that if he disclosed the inter-facility lending to the banks, they would not provide him loans, and without the loans, he could neither acquire new facilities nor get the sorely needed cash infusion the loans represented. SER 593. And so he lied: he signed covenants promising that each facility would not take on additional debt and would stand alone, and he provided those documents to investors. SER 126, 860. Additionally, when investors asked pointed questions about Sunwest's financial fitness, Harder gave them misleading financial statements and told them, often personally, that everything was fine. SER 886, 1277.

---

was demanding repayment and [a consultant] had been hired to alleviate [its] financial problems," and "assured investors that the [offering] numbers were reliable despite his knowledge that the actual numbers were substantially below expectations"—that is, in circumstances essentially identical to those here. *Id.* at 116.

In short, the evidence established that Harder, "through misrepresentation, intentionally deprived [his] victims of the opportunity to decide for themselves, on the basis of true and accurate information, whether or not to invest." *Treadwell*, 593 F.3d at 999. The district court did not clearly err in finding that all investors who heard these misrepresentations were equally defrauded as part of a single scheme.

C. The district court adequately considered Dozois's testimony.

Harder's revival of his hearing narrative—that his lawyers, particularly Dozois, developed the disclosures without his input or knowledge—is wasted on this Court. *See United States v. Bailey*, 444 U.S. 394, 414-415 (1980) ("It is for [the factfinder] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). The district court considered Dozois's testimony and did not err, clearly or otherwise, in declining to accept it.

"Context is important, and it is often unnecessary for the district court to provide a lengthy explanation and directly address each and every one of the defendant's arguments." *United States v. Rangel*, 697 F.3d 795, 806 (9th Cir. 2012); *see also Rita v. United States*, 551 U.S. 338, 356 (2007). Moreover, "[a] judge is not required, in making findings, to mention every item of evidence and either adopt it or reject it." *Western Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1285 (9th Cir. 1984). On appeal, this Court "presume[s]" that the district court "consider[ed] all of the evidence, and relie[d] on so much of it as supports the finding and reject[ed] what does not support the finding, unless the judge state[d] otherwise." *Id.* In the sentencing context, a "district court's

failure to [specifically address a party's argument] is not procedural error where 'adequate explanation' may 'be inferred from the PSR or the record as a whole.'" *United States v. Sandoval-Orellana,* 714 F.3d 1174, 1181 (9th Cir. 2013) (quoting *United States v. Carty,* 520 F.3d 984, 992 (9th Cir. 2008) (en banc)).[16]

Here, Dozois testified that he, not Harder, made the decisions about what to disclose to investors. *See* SER 390-393. The district court, however, implicitly rejected this testimony when it found that Harder controlled everything that happened at Sunwest, including what disclosures to make. ER 63. Ample evidence supports this conclusion. For example, Brody explained how Harder declined to include disclosures to banks, indicative of him controlling the process. SER 593, *see also* SER 587. Others said he controlled the whole company. SER 790-792. Dozois also contradicted all the investors when he claimed that investors were "never told that the money from a single property was going to stay there." *Compare* ER 419, *with* SER 385, 893, 1259. The district court was therefore comfortably within its capabilities as factfinder to reject Dozois's testimony in favor of the consistent picture painted by the other Sunwest insiders and investors. *See Anderson,* 470 U.S. at 574.

---

[16] Harder relies on *United States v. Tavano,* 12 F.3d 301, 305 (1st Cir. 1993), to argue that the court erred in failing to "give effective consideration and attention to" Dozois's role in Sunwest's marketing. Br. 62. But *Tavano* undermines Harder's argument because the First Circuit expressly limited the sentencing court's obligation to "mull[ing]" a defendant's evidence; the court required neither that the district court accept the defendant's evidence nor that it explicitly explain why it did not. *Id.* at 306, 307.

Harder's contention that the court "completely ignore[d]" Dozois's testimony, Br. 61, misses the mark. The passage Harder quotes is the summary from the end of the court's opinion that does not recite any facts. *See* ER 63. The opinion, however, addresses Dozois's claim that CCF's disclosures covered inter-facility lending and flatly rejects that view in favor of the investors' testimony. ER 41 n.46. The court also explicitly rejected Harder's similar testimony, finding it "too inconsistent with" the investors' testimony and that of Marcos and Thurber. ER 57. Similarly, during closing argument at the hearing, Harder repeatedly attempted to absolve himself by blaming his lawyers, relying heavily on Dozois's testimony, but the court repeatedly rejected that argument both because Harder had not claimed reliance on counsel when he admitted his intent to defraud the PMI investors and because others' "testimony [went] the other way." SER 2124, 2130, 2162-2165. That the court did not find Dozois's testimony persuasive does not mean the court ignored it or acted improperly. *Sandoval-Orellana*, 714 F.3d at 1181.[17]

---

[17] In a footnote, Harder contends that the court also erred in ignoring the forensic report he filed. Br. 61 n.51. Harder has insufficiently developed this issue to merit this Court's attention. *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000) (issue "present[ed] … in a lone footnote and [without] support" waived). In any event, the court did not ignore the point for which Harder uses the report—to argue that the Sunwest business model required an initial period of negative cash flow as the company worked to lease up the underperforming facilities. *See* ER 56 (explaining business model). The court faulted Harder not for his business plan, but for his failure to disclose all its material aspects to investors. ER 62; *see Treadwell*, 593 F.3d at 999.

**II. The District Court Did Not Abuse Its Discretion in Reading Public Letters During Phase I of Harder's Sentencing Hearing.**

Harder contends that the district court erred in reviewing letters sent by putative victims during Phase I. Br. 63-70. The record demonstrates (1) that the court limited its review during Phase I to factual issues properly before the court, (2) that the parties received copies of the letters and notice of the court's interest in particular issues raised, and (3) that the government acted as the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, requires.

A. Standard of review

This Court reviews a district court's decisions regarding sentencing procedure for abuse of discretion. *United States v. Ornelas*, 828 F.3d 1018, 1021 (9th Cir. 2016) (sentencing in absentia); *United States v. Laurienti*, 731 F.3d 967, 971 (9th Cir. 2013) (whether to hold an evidentiary hearing); *Carty*, 520 F.3d at 993 (procedural aspects of sentencing in general).

B. The court acted properly because the letters raised relevant issues.

District courts have broad discretion to structure sentencing proceedings. The court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446 (1972). Neither the Confrontation Clause nor the Federal Rules of Evidence apply, and "hearsay is admissible at sentencing, so long as it is accompanied by some minimal indicia of reliability." *United States v. Littlesun*, 444

42

F.3d 1196, 1200 (9th Cir. 2006) (internal quotation marks omitted); *see also* U.S.S.G. § 6A1.3(a).

Furthermore, it is well-settled that, unlike a jury, a court will not be swayed by having heard or read inadmissible or improper information. That is why no problem arises when, in a bench trial, the same judge both decides the admissibility of evidence and renders a verdict based solely on the admissible evidence. *See, e.g.*, *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994). And it is why the district court that presided at a defendant's trial may adjudicate his post-conviction motion casting aspersions on that trial. *Farrow v. United States*, 580 F.2d 1339, 1350 (9th Cir. 1978) (en banc). The sentencing context "is not unique" in this way. *Id.* This Court has found "little merit" in the argument that "volatile and inflammatory" statements provided to the district court in camera "necessarily affected" the court's sentencing decision because of the "potential for 'conscious or unconscious prejudice.'" *United States v. Lee*, 648 F.2d 667, 669 (9th Cir. 1981). As this Court explained, "[t]he very nature of the judicial function calls upon judges to rise above impermissible influences." *Id.*[18]

---

[18] In his summary of the argument, Harder contends that the district court erred in not considering the effect of "hindsight bias." Br. 46-47. This argument is waived because Harder elected not to flesh it out in the argument section of his brief. *E.g.*, *United States v. Davis*, 508 Fed. App'x 606, 609 (9th Cir. 2013) (unpublished). Furthermore, the evidence on which it relies—four articles by academic psychologists—is not in the record, was not before the district court, and should not be considered now. 9th Cir. R. 10-2 (defining the record on appeal); *see also United States v. Bischel*, 61 F.3d 1429, 1436 n.7 (9th Cir. 1995) ("new, post-trial addition[s]" to the

"To succeed on his due process claim," Harder "must establish the challenged information is (1) false or unreliable, and (2) demonstrably made the basis for the sentence." *United States v. Vanderwerfhorst*, 576 F.3d 929, 935-936 (9th Cir. 2009) (internal quotation marks omitted). Where "the record belies any indication that" the court based the sentence on the allegedly improper information, "[t]he reliance prong is simply missing," and the defendant cannot carry his burden. *Lee*, 648 F.2d at 669.

The court here was well within its discretion in "skimming" the letters in Phase I because they contained factual information relevant to the Phase I determination regarding the fraud's scope. SER 1872. Many of the letters addressed factual issues, including: how Harder lied to the victims, *e.g.*, ER 221, 228, 237-238, 241; how Sunwest inappropriately accredited investors, ER 225, 240; and how Harder was warned that undisclosed inter-facility lending was wrong, ER 230. The government's theory of the case, which the district court endorsed, was that Harder treated all the investors—PMI and TIC, from 2006 through 2008—the same by telling them the same lies. ER 62. Ample additional evidence from individual victims, SER 556, 1219, 1698, Sunwest employees, SER 474, 803, and Agent Gorman's survey of victims, SER 1251, showed the same.

---

record impermissible on appeal). And in any event, academic studies cannot overrule this Court's precedent.

To the extent the letters contained inflammatory statements about the damage Harder's scheme caused, Br. 67, the court is presumed to be able to separate relevant from irrelevant information and "to rise above impermissible influences." *Lee*, 648 F.2d at 669.[19] Moreover, nothing in the court's opinion relies on the statements Harder finds objectionable. Harder therefore cannot carry his burden of showing that any allegedly improper information was "demonstrably made the basis for the sentence." *Vanderwerfhorst*, 576 F.3d at 935-936. Despite Harder's protestations to the contrary, Br. 67-68, there exists no free-standing due process claim untethered from the district court's decision.

C. The process the court employed was fair.

The court also acted within its discretion in establishing a process for reviewing the letters. A "court need only provide the parties a reasonable opportunity to present information to the court" and the opportunity to "disclose[] information to the court" in writing suffices. *Laurienti*, 731 F.3d at 972 (internal quotation marks omitted).

---

[19] In addition, Harder contends without citation or support, that the letters contained inaccurate statements. Br. 67. But at least two of the examples he provides—that he used investor money to pay his legal fees and that he "continued to live a lavish lifestyle after Sunwest imploded," *id.*—are supported by the record. *E.g.*, SER 1520 (Harder received hundreds of thousands of dollars from the SEC receivership estate, *i.e.*, investor funds, to pay the lawyers and accountants who represented him in those proceedings); 1518 (Harder received $54,000 a month to fund his lifestyle following the Lone Star sale, more than six months after investors had stopped receiving payments). In any event, absent reliance, the presence of even patently false information in the sentencing record is not reversible error. *See Vanderwerfhorst*, 576 F.3d at 935-936.

45

Although a defendant usually has a right to see and respond to information used at sentencing, that right does not extend to having every piece of information presented in open court. *United States v. Mikaelian*, 168 F.3d 380, 386 (9th Cir.), amended, 180 F.3d 1091 (9th Cir. 1999) (disclosure to the defense remedies any issue caused by receiving sentencing information ex parte). This follows *a fortiori* from the fact that due process does not require an evidentiary hearing at all. *Laurienti*, 731 F.3d at 972.

Here, the court informed the parties it was reading the letters and gave them copies. SER 2, 5, 1871. Before questioning a witness about the letters' content, the court identified both the letter and the issue on the record. SER 1867. The court also welcomed Harder's response to any of the letters, not only those the court had singled out. SER 11. Throughout Phase I, the court also repeatedly told the parties what it was thinking and was open about its questions; nothing in the written opinion would have come as a surprise to anyone who had attended the hearing. *E.g.*, SER 1037-1053, 2020-2040. This process provided Harder with every "reasonable opportunity" to address the information. *Laurienti*, 731 F.3d at 972.

Contrary to Harder's contention, Br. 66, the court did not besmirch the appearance of justice by reading the letters in chambers rather than in open court because Harder had no right to a hearing, let alone one where every piece of evidence is read aloud. *See Mikaelian*, 168 F.3d at 386. Harder's conduct in this case also undermines his argument. The parties presented a vast amount of information to the court, only a fraction of which was discussed by the witnesses or read in open court. In

46

particular, Harder presented two expert reports only in writing and asked the court to review them in chambers, with no concern for his ability to monitor the court's reaction. SER 680. The requirement that the court articulate its view of the evidence on the record sufficiently protects the appearance of justice. *Rita*, 551 U.S. at 357 ("By articulating reasons … the sentencing judge … assures reviewing courts (and the public) that the sentencing process is a reasoned process….").

D. The government followed the CVRA.

The government did nothing improper in informing the victims of their right to be heard. The CVRA "mak[es] victims independent participants in the criminal justice process." *Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1013 (9th Cir.), subsequent mandamus proceeding, 453 F.3d 1136 (9th Cir. 2006). It expressly gives victims the right to "reasonable, accurate, and timely notice of any public court proceeding"; the right to "not be excluded from any such public court proceeding"; and the right "to be reasonably heard" at sentencing. 18 U.S.C. § 3771(a)(2), (3), (4). The government must make its "best efforts" to effectuate these rights. 18 U.S.C. § 3771(c)(1).

Because many of these rights apply before a court will have the opportunity to determine who qualifies as a victim, the government must make its own determination, when it files charges, whom to count. Here, consistent with the government's theory of the case, the government considered all Sunwest investors from 2006 on victims and treated them as such. Harder argues that it was inappropriate for the government to

47

treat the TIC investors as victims until the court issued its Phase I opinion because the court had not yet found them to be victims. Br. 69-70. This argument ignores the CVRA's structure. If accepted, it would prevent anyone from being a "victim" before trial, neutering the CVRA rights that apply at or before trial. *See, e.g.*, *In re K.K.*, 756 F.3d 1169 (9th Cir. 2014) (per curiam) (permitting victim to challenge defense subpoena pretrial).

Harder's reliance, Br. 68-69, on Joanne Pinelli's email, ER 216, is also misplaced. Assuming that the email accurately recounted her conversation with AUSA Garten, in context, Garten's request for the victims' mass attendance is best read as a factor that might influence the ultimate sentence, not the Phase I finding. ER 216 (stating that the "judge will be VERY swayed by the number of us who show up … It will be hard for the judge to give him a light sentence with masses of us in the room"). It is entirely appropriate for a court to consider the crime's effect on the victims, including "the financial ruin that [the defendant] caused," in imposing sentence. *Rangel*, 697 F.3d at 804; *see also United States v. Christensen*, 732 F.3d 1094, 1105 (9th Cir. 2013) (court may consider "intangible" effects of a fraud, such as the victims' stress and resulting divorce, in selecting the appropriate sentence).

And even if the government overstepped in urging the victims to participate, Harder has nonetheless failed to carry his burden of showing a due process violation. First, Harder does not explain how the victims' mere presence could be a "false or unreliable" fact. *Vanderwerfhorst*, 576 F.3d at 935. Second, he cannot show that the court

48

relied in any way on the victims' presence; "[t]he reliance prong is simply missing." *Lee*, 648 F.2d at 669.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

BILLY J. WILLIAMS
    United States Attorney
    District of Oregon

KELLY ZUSMAN
    Assistant United States Attorney
    Appellate Chief
    District of Oregon

LESLIE R. CALDWELL
    Assistant Attorney General

SUNG-HEE SUH
    Deputy Assistant Attorney General

SONJA M. RALSTON
    Attorney, Appellate Section
    Criminal Division
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W.
    Suite 1264
    Washington, DC 20530
    (202) 532-6047
    sonja.ralston@usdoj.gov

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6(a), undersigned counsel states that the government is not aware of any cases related to this appeal.

DATED:     DECEMBER 1, 2016

s/Sonja M. Ralston
Sonja M. Ralston
    Attorney, Appellate Section
    Criminal Division
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W.
    Suite 1264
    Washington, DC 20530
    (202) 532-6047
    sonja.ralston@usdoj.gov

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Brief for the United States was this day served upon Christopher J. Schatz, Robert B. Hamilton, & Emily Elison, counsel for appellant, by notice of electronic filing with the Ninth Circuit CM/ECF system.

DATED:    DECEMBER 1, 2016

s/Sonja M. Ralston
Sonja M. Ralston
   Attorney, Appellate Section
   Criminal Division
   U.S. Department of Justice
   950 Pennsylvania Ave., N.W.
   Suite 1264
   Washington, DC 20530
   (202) 532-6047
   sonja.ralston@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,297 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Garamond 14-point font in text and footnotes.

3. This brief complies with the privacy redaction requirement of Fed. R. App. P 25(a) because it contains no personal data identifies.

4. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

5. This brief has been scanned for viruses with the most recent version of McAfee VirusScan Enterprise, version 8.8.0, which is continuously updated, and according to that program is free of viruses.

DATED:       DECEMBER 1, 2016

s/Sonja M. Ralston
Sonja M. Ralston
    Attorney, Appellate Section
    Criminal Division
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W.
    Suite 1264
    Washington, DC 20530
    (202) 532-6047
    sonja.ralston@usdoj.gov